# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| **SITEPRO, INC.,** | |
| **Plaintiff,** | |
| **v.** | |
| **WATERBRIDGE RESOURCES, LLC, WATERBRIDGE OPERATING, LLC, WATERBRIDGE HOLDINGS, LLC, WATERBRIDGE MANAGEMENT, INC., AND THE INTEGRATION GROUP OF THE AMERICAS** | **C.A. No. 6:23-cv-00115-ADA-DTG** <br><br> **JURY TRIAL DEMANDED** |
| **Defendant.** | |

## COMPLAINT

Plaintiff SitePro, Inc. ("SitePro") files this Complaint against Defendants WaterBridge Resources, LLC, WaterBridge Operating, LLC, WaterBridge Holdings, LLC, WaterBridge Management, Inc. (collectively "WaterBridge"), and The Integration Group of the Americas ("TIGA"), respectfully alleging as follows:

## NATURE OF DISPUTE

1.     SitePro brings this lawsuit against WaterBridge and TIGA because WaterBridge breached its agreements with SitePro, and together, WaterBridge and TIGA, misappropriated SitePro's trade secrets, by improperly acquiring and using SitePro's trade secrets, making unauthorized access and use of SitePro's computer systems, and using such trade secrets and unauthorized computer access to replicate SitePro's technology into WaterBridge's clone analytics, monitoring, and control system.

1

2.     SitePro developed a revolutionary, award-winning, proprietary advanced IoT and control platform that allows organizations to monitor, control and analyze critical infrastructure in real-time.  SitePro's system enabled WaterBridge to become wildly successful.  WaterBridge grew from only two saltwater disposal ("SWD") facilities when it began using SitePro's proprietary system to over sixty facilities in four short years.  Then, as is every technology company's worst fear, WaterBridge used its direct access to SitePro's system, including knowledge of SitePro's most valuable trade secrets, to create WaterBridge's own clone system (the WaterBridge Clone System).  WaterBridge brought in TIGA to replicate SitePro's proprietary system.   WaterBridge and TIGA could have developed an independent system, starting from scratch without using SitePro's intellectual property.  But they did not.  Instead, they accessed and used SitePro's proprietary system (including SitePro's trade secrets) to develop, test, troubleshoot, and refine the WaterBridge's Clone System, and WaterBridge continues to this day to access and use SitePro's system to troubleshoot and refine the WaterBridge Clone System.

3.     This lawsuit demonstrates why there must be intellectual property laws, and why the United States legal system must protect those intellectual property laws.  Protection of intellectual property has its roots in the very foundation of this country, as the United States Constitution: Article I, Section 8, Clause 8: "[The Congress shall have Power . . . ] To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."   Based on this constitutional foundation, the laws of Texas and the United States provide for the enforcement of contracts that prohibit the unauthorized use and disclosure of confidential information, as well as the ability to stop and recover for misappropriation of trade secrets and unauthorized access to proprietary

computer systems.  Through this lawsuit, SitePro asserts these laws to stop WaterBridge and TIGA from their illegal conduct, and recover damages for the harm WaterBridge and TIGA have caused.

4.     SitePro seeks to enjoin the use by WaterBridge and TIGA of any SitePro property, trade secrets, confidential information, and proprietary developments; to recover its misappropriated trade secrets, confidential information, and proprietary developments; and to recover actual and punitive damages, as well as reasonable attorneys' fees.

## THE PARTIES

5.     Plaintiff SitePro, Inc. is a Delaware corporation having its principal place of business at 9502 US-87, Lubbock, TX 79423.

6.     Defendant WaterBridge Resources, LLC (aka "WBR LLC) is a Delaware limited liability company, with its principal place of business at 840 Gessner Rd., Ste. 100, Houston, Texas.  WaterBridge Resources LLC is the parent company of Arkoma Water Resources LLC, EnWater Solutions, LLC, WaterBridge Midstream Operating LLC, WaterBridge Texas Midstream LLC, and WaterBridge Operating LLC.  WaterBridge Resources LLC may be served through its registered agent, Capital Services, Inc., 108 Lakeland Ave., Dover, Delaware 19901.

7.     Defendant WaterBridge Operating, LLC, a Delaware limited liability company, is a subsidiary of WaterBridge Resources, with its registered principal place of business at 820 Gessner Rd., STE 650, Houston, Texas.  WaterBridge Operating, LLC may be served through its registered agent, Capital Corporate Services, Inc., 1501 S Mopac Expy Ste 220, Austin, TX 78746.

8.     Defendants WaterBridge Operating, LLC and WaterBridge Resources, LLC operate collectively as WaterBridge, along with other affiliated companies.  WaterBridge also has a corporate headquarters at having its headquarters at 5555 San Felipe; Suite 1200, Houston, TX 77056; with the following West Texas and Oklahoma offices: Midland Office: 303 West Wall Street; Suite 700, Midland, TX 79701; Pecos Field Office: 5 CR 131, Pecos, TX 79772; Abilene

Office: 1025 Oak St., Abilene, TX 79602; and McAlester Field Office; 1501 E. Pierce Ave, McAlester, OK 74501.

9.    Defendant WaterBridge Holdings, LLC, a Delaware limited liability company, is a parent of WaterBridge Resources, with its principal place of business at 820 Gessner Rd., STE 650, Houston, Texas.  WaterBridge Holdings LLC may be served through its registered agent, Capital Services, Inc., 108 Lakeland Ave., Dover, Delaware 19901.

10.    Defendant WaterBridge Management, Inc., a Delaware limited liability company, is a parent of WaterBridge Resources, with its principal place of business at 820 Gessner Rd., Ste 650, Houston, Texas.  WaterBridge Management, Inc. be served through its registered agent, Capital Services, Inc., 108 Lakeland Ave., Dover, Delaware 19901.

11.    Defendant TIGA is a Texas corporation and is a subsidiary of Tetra Tech, Inc., and has a registered principal place of business at 1790 Hughes Landing Blvd, Ste. 400, The Woodlands, Texas, 77380-1691.  TIGA also has a place of business at 25700 I-45 N, Suite 480, Spring, Texas 77381, and has its West Texas Local Service Facility at 4883 S, TX-464 Loop, Monahans, Texas 79756.   TIGA may be served via its register agent, CT Corporation System, at 1999 Bryan St. Suite 900, Dallas, TX USA 75201-3136.

12.    A substantial part of the events giving rise to SitePro's causes of action as alleged herein occurred in the Western District of Texas, and have a direct effect on SitePro in the Western District of Texas.  SitePro identified the involved WaterBridge entities to the best of its ability, however, there are multiple WaterBridge entities registered in both Delaware and Texas and the corporate structure if difficult to discern.

## JURISDICTION AND VENUE

13.    This Court has original jurisdiction of this action pursuant to the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq* and 28 U.S.C. § 1331.  This Court has supplemental

jurisdiction over the pendant state law claims asserted herein, pursuant to 28 U.S.C. § 1367. These claims derive from a common nucleus of operative facts and are so related that they form part of the same case or controversy.

14.   This Court also has original jurisdiction of this action pursuant to the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 and 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over the pendant state law claims asserted herein, pursuant to 28 U.S.C. § 1367.  These claims derive from a common nucleus of operative facts and are so related that they form part of the same case or controversy.

15.   The Court also has jurisdiction over this action by virtue of the agreements at issue in this case between SitePro and WaterBridge that state, "[a]ny legal suit, action or proceeding arising out of or relating to this Agreement may be instituted in the federal courts of the United States of America or the courts of the State of Texas, and each party irrevocably submits to the jurisdiction of such courts in any such suit, action or proceeding."

16.   Venue is appropriate in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, including but not limited to, the following: the SWD facilities at which SitePro provided services to WaterBridge are in this judicial district, the SWD facilities at which WaterBridge and TIGA made unauthorized use of SitePro's system, and accessed that system for an inappropriate and unlawful purpose, (the system including its trade secrets and confidential information), many of the meetings between SitePro and WaterBridge at which the agreements at issue in this litigation occurred at WaterBridge's offices and SWD facilities within this judicial district, and the ongoing misappropriation of SitePro's trade secrets has occurred and continues to occur at SWD and oil and gas facilities located throughout this judicial district.  Further, the great

majority, if not all, actions and events set forth in this Complaint occurred within this judicial district.

## GENERAL ALLEGATIONS

### SitePro's Business Activities, Trade Secrets, and Other Confidential and Proprietary Information and Technology

17. For more than a decade, SitePro has been at the forefront of data analytics, monitoring, and control of fluids in the energy (SWD and Oil &Gas), municipal and agriculture industries. SitePro initially sought to enable the digital oil field. From there, it evolved its technology for use in the municipal and agriculture industries. SitePro focuses on developing market-leading software and hardware products that deliver easy-to-use, scalable fluid analytics, monitoring, and control. SitePro has developed and continues to develop state-of-the-art, award-winning software products, hardware, and equipment. SitePro combines an integrated, best-in-class cloud-based software as a service (SaaS) and mobile application. Both SitePro's software and hardware products and cloud services are vital to SitePro and its customers' businesses.

18. SitePro began as AmpliSine Labs, LLC, which was founded in November 2009 by Aaron Phillips. David Bateman joined Aaron in 2011, and the first year of revenue for the SWD market was 2012. AmpliSine Labs changed itse name to SitePro, LLC (Texas entity) in July 2018 and then ultimately to SitePro, Inc. effective 1/1/2019. Bateman and Phillips both graduated from Texas Tech with engineering degrees. Bateman graduated in 2008 with an Industrial Engineering degree and followed with an MBA in 2012. Phillips graduated in 2007 with his Industrial Engineering degree and followed by a Masters in 2008. After completing all Ph.D. coursework and dissertation, he started AmpliSine Labs to patent and commercialize his work instead of defending his dissertation. The company was founded to focus on reimagining control and

management systems in the underserved SWD market, which in 2011 was a process-intensive business with limited viable software options outside of expensive traditional SCADA systems.

19.   In launching their company, Bateman and Phillips first explored using existing SCADA systems but quickly determined that the then state-of-the-art SCADA systems were inadequate for the SWD industry and the problems facing their potential SWD customers.   So Phillips and Bateman developed their own proprietary system from scratch.

20.   Traditional oil field control systems had an automation system that was installed onsite to control the equipment on that site, including pumps, valves, actuators, etc., while also gathering data from sensors within the system or input from individuals at the site.   Then there would be a SCADA system that allowed access to that data from a web-based platform.

21.   SitePro's system was (and is) unique and went well beyond these traditional systems in developing proprietary technology that combined the onsite automation system with the web-based control platform in one application.   For example, SitePro's proprietary system features a "no-code" configuration module, advanced ticketing capabilities, and real-time integrated mapping and visualization never previously offered or envisioned by traditional SCADA systems.   SitePro later departed from the physical server setup used by traditional systems at the time, and instead built its new platform on Microsoft's Azure cloud.   SitePro's proprietary system monitors tank levels, volumes, pressures, flow rates, and many other data points in real-time. It allows organizations to control pumps and valves right from a smartphone or a computer. SitePro's system is robust and comprehensive, covering real-time data analytics, truck ticketing transactions, and remote management of multiple sites (like an SWD facility) remotely from an office in a large city.   SitePro's system also offered scalability well-beyond traditional SCADA systems by pre-programing and creating new parameters for certain nodes and equipment

commonly found in an SWD system so that customers (regardless of technical aptitude/familiarity) could quickly and safely add, remove, edit and control equipment, such as actuators, pumps, valves, and sensors.  SitePro additionally developed a mobile application so that its customers could access data, collect data, and control equipment from their mobile devices.  In fact, SitePro's proprietary system enabled a sensor reading to be delivered to a user's browser or mobile application less than one second after it was taken in the field.

22.  SitePro was awarded multiple United States patents for its inventions in many technical areas including edge computing, protocol translation (e.g., in which a remote server speaks a single universal language to monitor and control systems in the field, and local "site master controllers" translate those commands in the universal language to device-specific protocols, like Modbus, USB, etc.), and multi-tenant SaaS systems for monitoring and controlling fluid-handling equipment.

23.  In addition, SitePro has maintained other inventions and know-how it has developed as its proprietary confidential trade secrets, as set forth below.

24.  SitePro's revolutionary, proprietary technology has been recognized and awarded in industry.   For example, in September 2022, SitePro was honored with a "TechConnect Defense Innovation Award."   Companies from across the country showcased their technology at the TechConnect Defense Innovation Summit & Expo, which was judged in collaboration with various United States government entities such as the Department of Defense, Homeland Security, Army, Navy, and Air Force. Only the highest-ranking technologies were selected for Innovation Awards. SitePro's technology was awarded for the "potential positive impact the submitted technology will have for the warfighter and national security." SitePro's software won in the category of Energy, Infrastructure, and Resilience.

25.  SitePro's proprietary control platform and system prioritize transparency, scalability, and security; it puts the power over critical infrastructure management directly in the hands of operators while identifying and deflecting attacks, ensuring the continued protection of our world's most critical resources. SitePro's customers for its sophisticated proprietary system include small and mid-sized businesses as well as large enterprises all over the country, including leaders in energy (SWD and Oil & Gas), municipal and agriculture industries.

26.  Having developed its business and well-earned reputation for quality since 2011, SitePro has grown its business to more than 55 employees and 113 customers.

27.  SitePro's success is based on the knowledge, know-how, creativity, and testing that make up its confidential and proprietary intellectual property and trade secrets.  Over the years, SitePro has invested significant resources to develop its products, hardware, software, equipment, and cloud services, and its internal development, documentation, and manuals regarding its products, hardware, equipment, and cloud services.

28.  To protect its investment, the development and use of SitePro's analytics, monitoring, and control technology is kept confidential and is subject to strict controls and measures to maintain secrecy and confidentiality.  For instance, SitePro employees are only authorized to use and receive such information after executing non-disclosure agreements.  Those agreements require that employees not only keep proprietary information confidential, but that they do not disclose, use, or publish proprietary information except in connection with their work for SitePro.  SitePro employees also agree that they will not disclose or publish any material relating to their work at SitePro or which incorporates SitePro's proprietary information absent the written consent of SitePro.

29. SitePro takes other reasonable steps to protect trade secrets and other confidential proprietary information by protecting its facilities, servers, computers, networks, databases, and communications systems using a variety of physical and electronic security systems, such as access cards, password protected systems, encrypted communications technology, and vendor and employee non-disclosure agreements.

30. In addition, SitePro's agreements with its customers, like WaterBridge, include specific protection for its trade secrets and confidential information. SitePro limits and restricts access to its system to its customers and employees. SitePro also requires that its customers, like WaterBridge, identify a limited number of customer employees to have access to SitePro's proprietary system.

**SitePro's Relationship with WaterBridge**

31. WaterBridge was founded around 2010 to provide gathering and disposal of produced salt water. It was originally known as Pelagic Water Systems until 2016, then EnWater Solutions until 2017, then WaterBridge. It has a network of purpose-built produced water disposal facilities that are interconnected by large-scale water pipeline infrastructure throughout the southern Delaware Basin in west Texas and the Arkoma Basin in southeastern Oklahoma.

32. SitePro began its relationship with WaterBridge (then Pelagic Water Systems) in or around May of 2015 when SitePro first worked with Pelagic on an SWD site called EasyJet. This was WaterBridge's (then Pelagic's) second SWD site. On their first SWD site, WaterBridge installed a control System from a company called Patriot, which was owned by individuals with whom Jason Long, the CEO of Pelagic, had a prior relationship. According to Pelagic, the Patriot System performed very poorly. It was a traditional SCADA system, with intermittent, not continuous, data collection. It employed basic "if-then" style ladder logic, with no scaling and no buffering. It had basic "read-out" remote monitoring. Individual field engineers/pumpers had to

go to the site to make changes to command logic at the site.  The server talked "Modbus" via radio to a field of wells, and the field controller talked to fluid controllers via Modbus.  The system had signification communication problems, and WaterBridge's equipment and facility were being compromised.

33.   Quite differently, SitePro's proprietary system used (and uses) a JSON message format plus encryption, and the field controller at the site translates into Modbus so the field controller can command equipment, such as actuators, pumps, valves, or request data from a sensor.   SitePro's proprietary system allowed (and allows) the system to provide context to the field controller instructions.  SitePro's system provided (and provides) continuous, real-time data acquisition and control.   SitePro's proprietary edge-computing technology allowed (and allows) for control and buffering of field equipment even in the absence or loss of radio, Wi-Fi cellular, or other wireless communication links.   SitePro's proprietary system offered (and offers) a mobile platform so that field engineers can access and collect data in real-time, and control equipment from their mobile phones, tablets, or field computers.

34.   For these, and many other reasons, WaterBridge switched its first Easyjet site from Patriot's SCADA system to SitePro's proprietary platform and system.  Over the next four years, WaterBridge put SitePro on more than sixty new SWD sites, all implementing SitePro's proprietary system.    Before SitePro, when WaterBridge used Patriot's SCADA technology, WaterBridge had to deploy at least five, if not more, workers per site.  Such workers are referred to as facility operators or pumpers.  Using SitePro's proprietary technology, WaterBridge was able to manage five sites with only one pumper.   In addition, through using SitePro's proprietary technology, WaterBridge was able to enjoy significant savings and profits in areas of human

resources, truck ticketing, water management, equipment maintenance, equipment replacement, equipment loss, regulation filings, and many other areas.

35.   One of the services developed and offered by SitePro in 2018 was called SitePro Operations Support ("SOS"), which was later named SitePro's Remote Operations Center ("ROC").   The SOS / ROC is located at SitePro's corporate office and provides a 24/7 remote operations support subscription service, with highly trained personnel continuously monitoring, evaluating, and adjusting customer assets from a centralized control room.   WaterBridge implemented the SOS / ROC in this timeframe.   In the fall of 2019, WaterBridge requested that SitePro assist WaterBridge in building its own ROC at WaterBridge's own office.   Based on the long relationship that SitePro had with WaterBridge, SitePro assisted WaterBridge in the development of WaterBridge's ROC and the transition of the SitePro system oversight to the WaterBridge ROC.

36.   WaterBridge's success, based in large part on its use of SitePro's proprietary system, allowed WaterBridge in 2018 to secure up to $800 million in financing that will be used to    expand    its    presence    in    the    Permian    Basin    of    West    Texas. https://www.chron.com/business/energy/article/WaterBridge-Resources-secures-800-million-for-13483974.php.   Through this transaction, WaterBridge became a portfolio company of Five Point Energy, founded in 2016 and based in Houston, Texas.

37.   Then in 2019, based on its continued success and expansion enabled by SitePro's technology, WaterBridge raised $345 million of equity capital through Five Point Energy LLC, its Private   Equity   owner.       https://h2obridge.com/news/waterbridge-announces-closing-of-345-million-of-additional-equity-capital-to-fund-strategic-acquisitions/.   In 2019, Five Point Energy sold a minority stake in WaterBridge to affiliates of Singapore's sovereign wealth fund, GIC.   The

transaction implies an enterprise value of about $2.8 billion for WaterBridge. https://www.reuters.com/article/waterbridge-resources-stake-idUSL4N22T3JP.

38. This dramatic success, growth, and expansion of WaterBridge could not have occurred without its use and reliance on SitePro's proprietary system.   WaterBridge itself touted the importance of SitePro's proprietary system.   For example, in a promotion for Microsoft's Azure cloud, the cloud services provider chosen by SitePro to host its proprietary system, WaterBridge's Vice President of Operations, Michael Reitz, noted the importance SitePro's proprietary system, allowing WaterBridge to build out to its customers' needs and monitor its SWD facilities in real-time.

**SitePro's Contracts With WaterBridge**

39. SitePro and WaterBridge entered into valid and enforceable contracts for each of the WaterBridge sites that implemented SitePro's proprietary system.

40.   Under these contracts, SitePro would perform a variety of services for WaterBridge, and the contracts would set forth those services, e.g.,

> Services. Company shall provide certain services to customer in accordance with the applicable Order and these Terms (the "Services"). As specified in the applicable Order, the Services may consist of one or more of the following: (a) installation services ("Installation Services"); (b) professional services ("Professional Services"); (c) software as a service ("SaaS Services"); or (d) managed services ("Managed Services").

41. Thus, WaterBridge and SitePro would agree in the applicable contract for the services that WaterBridge wanted for that particular site.

42. Under these contracts, SitePro would also sell and deliver "Goods," such as computer hardware and other equipment for use in connection with SitePro's propriety system.

43. Because WaterBridge's access to the Services and Goods provided by SitePro would necessarily expose WaterBridge to SitePro's most valuable intellectual property (including

trade secrets), SitePro importantly included contractual protections and safeguards for its intellectual property.  For example, these contracts included a Confidentiality provision prohibiting WaterBridge's ability to use or disclose SitePro's confidential information for any use other than performance under the contract, e.g.,

> <u>Confidential Information</u>. All non-public, confidential or proprietary information of Company, including, but not limited to, specifications, samples, patterns, designs, plans, drawings, documents, data, business operations, customer lists, pricing, discounts or rebates, disclosed by Company to Customer, whether disclosed orally or disclosed or accessed in written, electronic or other form or media, and whether or not marked, designated or otherwise identified as "confidential," in connection with this Agreement is confidential, solely for the use of performing this Agreement and may not be disclosed or copied unless authorized in advance by Company in writing. Upon Company's request, Customer shall promptly return all documents and other materials received from Company. Company shall be entitled to injunctive relief for any violation of this Section. This Section does not apply to information that is: (a) in the public domain; (b) known to Customer at the time of disclosure; or (c) rightfully obtained by Company on a non-confidential basis from a third party.

44.    Plainly, on even a cursory reading of this provision, it should be clear that use and disclosure of SitePro's confidential information, such as the data flow from or operations of SitePro's system for the purpose of building another analytics, monitoring and control system, is a clear violation of this provision.

45.    Moreover, so there would be no question about who owned the relevant intellectual property, SitePro also included a provision in its <u>contracts</u> with WaterBridge that

> <u>Intellectual Property</u>.  All intellectual property rights, including copyrights, patents, patent disclosures and inventions (whether patentable or not), trademarks service marks, trade secrets, knowhow and other confidential information, trade dress, trade names, logos, corporate names and domain names, together with all of the goodwill associated therewith, derivative works and all other rights (collectively, "Intellectual Property Rights") in and to all documents, work product and other materials that are delivered to Customer under this Agreement or prepared by or on behalf of the Company in the course of performing the Services, including any items identified as such in the Order (collectively, the "Work Product") shall be owned by Company. Company hereby grants Customer a limited, non-exclusive, non-transferable, non-sublicensable license under any Intellectual Property Rights

of Company that are embodied in any Work Product provided by Company to Customer hereunder to the limited extent necessary to enable Customer to make reasonable use of such Work Product for the duration of the applicable Order. For avoidance of doubt, the foregoing license expressly excludes any software or applications in connection with the Technology Services. Where contemplated by the applicable order for Technology Services, certain software or applications may be made available by Company for use by Customer or its authorized users, as applicable, pursuant to the applicable Technology Services Terms.
.

46.   In this clause, it is made plain that SitePro owns the intellectual property rights in not only documents, work product and all other materials delivered to WaterBridge, but also such intellectual property materials prepared by or on behalf of WaterBridge in the course of performing the Services under the Agreement.

47.   The above contractual obligations are merely exemplary, as there are additional contractual obligations between SitePro and WaterBridge that WaterBridge has violated.

**WaterBridge's Operation Independence**

48.    In August of 2019, WaterBridge hired Charles Lame as its Director of Field Services.  Lame became the main point of contact for SitePro's interactions with WaterBridge. Beginning in late 2019 and early 2020, WaterBridge demanded that SitePro add staff in order to better support WaterBridge.   In addition, in this same time period, WaterBridge also discussed extending all of SitePro's contracts for lengthier periods of time.   Further, as noted above, WaterBridge requested that SitePro assist WaterBridge in developing its own ROC at WaterBridge's facility to host 24/7 monitoring of the SitePro proprietary system and platform.

49.   Also in this late time frame 2019 and early 2020 time frame, WaterBridge included as authorized users on its SitePro account individuals with the email addresses @tiga.com, listing them as WaterBridge "facility operators" on their listings of authorized users for the SitePro

proprietary system.  Unbeknownst to the SitePro team, WaterBridge had hired TIGA, including team lead, Trent Boudreaux, to assess and learn the SitePro proprietary system under the cover of appearing as WaterBridge facilities operators so that WaterBridge and TIGA could develop WaterBridge Clone System based on SitePro's proprietary system.

50.   On February 17, 2020, WaterBridge informed SitePro via email that WaterBridge had "decided to move everything onto the ignition platform," switching out all of its SWD sites from SitePro's propriety system to another unnamed platform based on Ignition Software.  David Bateman of SitePro expressed his shock at such news, and requested an in-person meeting with WaterBridge.  The parties had the in-person meeting where WaterBridge explained its reasons for moving on from SitePro, plainly admitting that once WaterBridge reached more than 35 wells using SitePro, it made economic sense for WaterBridge to develop its own monitoring and control software using the Ignition software, and they had hired TIGA to develop and integrate WaterBridge's own monitoring and control software.

51.   Over the course of 2020, WaterBridge slowly transitioned its facilities off SitePro's proprietary systems, and terminated its contracts with SitePro. Given that SitePro's contracts all included survival clauses that maintained WaterBridge's contractual obligations regarding Confidentiality and Intellectual Property after termination of the contracts, SitePro trusted that WaterBridge had honored and would continue to honor its contractual commitments to not make unauthorized use of SitePro's intellectual property.

52.   Then in the late fall of 2020, SitePro received its first indication that WaterBridge had not honored its contractual obligations, and had in fact misused and misappropriated SitePro's trade secrets, together with TIGA, to develop the WaterBridge Clone System.  Specifically, on October 1, 2020, WaterBridge issued a press release that WaterBridge's "Project Independence"

16

had won an award.  The press release, captured at https://h2obridge.com/news/waterbridges-project-independence-received-the-2020-firebrand-award-at-the-annual-icc-conference/, went into great detail, and explained WaterBridge and TIGA had implemented an IOT-enabled SCADA system hosted within a hosted Microsoft Azure infrastructure, just like SitePro's proprietary system.  In the press release was a video that included members of TIGA describing the development of the WaterBridge Clone System.  Trent Boudreaux explained that TIGA had worked with WaterBridge to deploy Ignition Edge Panels at 65 SWD facilities using "Industrial PCs," which was a term that David Bateman had personally coined.  The description of the WaterBridge system, as well as the pictures in the video, showed that TIGA and WaterBridge had not developed a new system or implemented an original, different third-party system, but they had instead completely mimicked the functionality and features of SitePro's proprietary system.  The video suggested that WaterBridge's Clone System was the first to implement edge computing concepts for remote control, truck ticketing, data capture and camera management when SitePro's system had already included that capability for years.  The video further touted WaterBridge's Clone System's ability to provide centralized real-time data, which the SitePro proprietary system had also provided for years.  The video also revealed the WaterBridge Mobile application, shown below.



53.   This WaterBridge mobile app was remarkably similar to SitePro's mobile app, and had obviously been derived from SitePro's mobile app.   Indeed, the video further explained that when navigating to a specific facility, the application would allow the user to see detailed information regarding all of the equipment at the facility, shown below:



54.   Again, remarkably, the information and detail provided on the WaterBridge app was the same, and in the same format, including the tabs being the same and in the same order, as the SitePro mobile application.   It was plain that WaterBridge and TIGA had derived the WaterBridge app from the SitePro app.  Even worse, when the user of the WaterBridge app looked at trends for a particular piece of equipment, the trend selections of 3 days, 7 days, 30 days and custom (as shown below), which were the exact same trends captured and offered in the SitePro app, it was clear that WaterBridge and TIGA had not just mimicked SitePro's Mobile App, but had also used SitePro's proprietary data flows and structures.



55.   TIGA also published a case study that further confirmed SitePro's worst fears. https://www.tiga.us/case-studies/using-iiot-for-improved-operational-outcomes.      The   article confirmed that rather than being WaterBridge's facility operators, TIGA has instead gained access as an authorized WaterBridge user of SitePro's system to perform "a phase one engineering assessment" of the SitePro system and to "define a migration path" to allow WaterBridge to

develop its own system based on SitePro's system.   The article further noted that "TIGA worked with WaterBridge Operating to ***repurpose*** the existing OnLogic IPC at each SWD facility and integrate Ignition Edge Panel for the local HMI." (emphasis added).   These existing OnLogic IPCs included SitePro's proprietary trade secrets.

56.   The article further claimed that WaterBridge and TIGA invented a truck system was actually taken from SitePro.   The article stated the following: "TIGA's team developed a process to make the most current Texas RRC Lease and Drilling Permit data available for selection at the Edge devices used for Truck Unloading. Local HMI screens were developed to find and correct missing information on Truck Tickets created at those Edge devices. Using the corrected Truck Ticket information and Metered Piped volumes, TIGA developed a process to allocate Skim Oil Sales and report them on the Texas RRC P18 form. Ignition Edge Panel deployed at each SWD facility is centrally managed from the Enterprise Ignition System in Azure utilizing the Enterprise Application Module."   This is the same truck ticketing system that SitePro had previously developed and implemented, as demonstrated in its platform with its ROC Ticket software that had been in place for years.   ROC Ticket is a "done-for-you" service to reconcile a customer's electronic tickets with its accounting software while identifying the tickets and invoices that need attention, and also pulling in the necessary regulatory reports.   Indeed, SitePro had posted an overview video on this technology two years prior at https://blog.sitepro.com/resources/blog/oil-and-gas-field-ticket-reconciliation-done-easy.

57.   And there were other tale-tell signs in this article and others that followed shortly that WaterBridge had not lived up to its contractual promises, and TIGA and WaterBridge had improperly used SitePro's trade secrets to develop the WaterBridge Clone System.

**SitePro's Reaction**

58.     In addition to the realization that its proprietary system had been wrongfully taken by WaterBridge and TIGA, SitePro also faced an economic one-two punch of losing its largest customer at the same time the economy was collapsing under the weight of the COVID pandemic. SitePro considered suing to protect its rights and intellectual property, but it was also under the heavy weight of COVID, and having to downsize to stay in business.  Rather than closing its doors during the pandemic, which SitePro considered, SitePro instead fought to maintain adequate capital by applying for PPP loans, and then sold and leased back its offices to raise money. Effectively, SitePro mortgaged its house to stay in business and keep its employees on the payroll.

59.  Having lost its largest SWD customer, WaterBridge, SitePro decided to invest its capital and resources into diversifying its customer base.  Over the past two years, SitePro has been successful in those endeavors by winning many new customers in the municipal, oil and gas production and agriculture industries.   Still, WaterBridge's wrongful, illegal and malicious conduct has forever crippled SitePro, and removed it from the trajectory it was on.

**WaterBridge Enjoys Great Success with the Illegal Use of SitePro's Intellectual Property**

60.  Since ending its authorized use of SitePro's proprietary system, WaterBridge has expanded its footprint of facilities.  In 2021, although much of the industry was stymied under the pressures of the COVID pandemic, WaterBridge closed a transaction with Colgate Energy, LLC ("Colgate") to acquire the produced water infrastructure associated with Colgate's recent asset acquisition from Occidental.   The acquired assets include ten water handling facilities and associated water midstream infrastructure with an aggregate handling capacity of approximately 100,000 bpd, as well as approximately 50 miles of produced water pipelines. Jason Long, Co-Chief Executive Officer and Chief Operating Officer of WaterBridge. "This transaction further enhances our ability to manage and distribute over two million barrels per day of produced and

recycled water across our Permian platform." https://h2obridge.com/news/waterbridge-announces-strategic-acquisition-of-produced-water-assets-and-expanded-dedication-with-colgate-energy-in-the-delaware-basin/

61. In 2022, WaterBridge closed another deal with Texas Pacific Land Corp that would allow WaterBridge access to over 60,000 acres in Loving and Reeves counties (Delaware Basin) to expand its produced water management and infrastructure operations. https://www.texaspacific.com/investors/news-events/press-releases/detail/135/texas-pacific-land-corporation-and-waterbridge-ndb-llc-form

62. On information and belief, WaterBridge implemented its WaterBridge Clone System at these new facilities.

**WaterBridge Implements the WaterBridge Clone System on Facilities Owned by SitePro's Customer EVX Midstream**

63. EVX Midstream Partners was formed in 2015. EVX is focused on the development of crude oil, natural gas, and produced water gathering, processing, treating and transportation assets in the Permian Basin, Eagle Ford, and Mid-Continent. EVX first became a SitePro customer in December of 2018, and SitePro has since that time entered into contracts with EVX to provide various components of the SitePro proprietary system on twenty-three facility sites. EVX had a SitePro Ops Center subscription at fifteen of these sites. SitePro's contracts with EVX include clauses protecting SitePro's intellectual property, such as those noted above in the WaterBridge contracts.

64. In August of 2022, SitePro learned that WaterBridge had begun to convert three of EVX's sites entirely to the WaterBridge Clone System, including ticketing and cameras. EVX had not cancelled its contracts with SitePro, but allowed WaterBridge access to these three facilities without seeking permission from SitePro. In that same time frame, SitePro was informed

that WaterBridge was running the EVX sites.  WaterBridge requested copies of the contracts between EVX and SitePro, requesting them by email stating, "Per our conversation, can you please send over a copy/copies of the service contract(s) between EVX and SitePro."  SitePro provided Site/EVX contracts to WaterBridge.  Neither EVX nor WaterBridge has provided notice of termination of any of the twenty-three EVX / SitePro contracts.

65.  As of January 31, 2023, WaterBridge had deactivated the SitePro proprietary platform at nineteen of the twenty-three EVX facility sites, and on information and belief, WaterBridge had implemented its WaterBridge Clone System at those nineteen sites.   The four EVX facility sites still had SitePro active, but were in different states.  The EVX Bronco SWD facility had SitePro in an online state but the SitePro proprietary platform did not appear to be operating the site. The EVX Drifter SWD facility also had SitePro in an online state but again the SitePro proprietary platform was not operating the facility.  In addition, the cameras that feed into the SitePro system were disconnected.  The EVX Firefox SWD facility had SitePro online, but did not appear to be operating via SitePro.  Finally, the EVX Lightfoot SWD facility was fully operating on the SitePro proprietary platform.

66.  Also on January 31, 2023, SitePro learned that WaterBridge was importing disposal ticketing data and other data from WaterBridge's Clone System back into the SitePro proprietary platforms that it had taken offline.   In this way, WaterBridge was able to calibrate and verify data from its own clone system, and also run reports that its WaterBridge Clone System may have been unable to run.  Further, in the month of January, EVX added eleven new authorized users on the SitePro proprietary system, most from WaterBridge, much more than any other customer in that time period.  Such addition of the large number of authorized users is highly suspect considering

that WaterBridge was in the process of converting all of the EVX facilities to the WaterBridge Clone System.

67.   In early February 2023, Joey Philippi of WaterBridge was logged into the SitePro proprietary system at the EVX Drifter SWD facility, which was not operating on the SitePro system, but on information and belief had already implemented the WaterBridge Clone System. Philippi, while logged into the SitePro SiteControl local applications, placed the SitePro control software into DEBUG MODE, causing the API and local SitePro SiteControl software to no longer communicate with SitePro's control center with no alarm.  Mr. Philippi attempted to modify the COM port settings of the local Industrial PC and software, as well as attempting to make many other changes to the SitePro local applications.  Given that the SitePro proprietary system was not operating the Drifter SWD facility, there would be no legitimate reason for WaterBridge to be attempting to make such changes other than to troubleshoot, check and validate its own WaterBridge Clone System that is also active at the EVX Drifter SWD facility.  Such access and usage of the SitePro proprietary system was not authorized by SitePro.  On information and belief, WaterBridge employees have many additional unauthorized uses of SitePro's proprietary system at other EVX facility sites.

68.  Also in early February of 2023, SitePro confirmed that WaterBridge had its WaterBridge Clone System running at the EVX Bronco SWD facility, at which facility SitePro was still online but not running the facility.  Inspection of the equipment at that location confirms the integration of SitePro's digital and analog controls and logic into the WaterBridge Clone System.  In the picture below, the BLUE boxes show the SitePro installed components, including the original Industrial PC.  The design of the overall panel as well as the ADAM device logic, the terminal block wiring, the power tie-ins, and network devices are all SitePro's design.  The NUVO

5002e computer (upper left) is still in the panel and connected, and is still running the SitePro

SiteControl software in tandem with the WaterBridge Clone System.  The RED box shows the

additional devices installed into the existing panel by WaterBridge personnel to bypass the original

IPC and tie in the other existing components.  In addition, WaterBridge employees had unplugged

the cameras from the Moxa Switch, so that the SitePro system would not have access, the cameras

had additional Cat5 connections plugged in, which on information and belief, was used for

WaterBridge's internal use and troubleshooting.



69.  The fact that WaterBridge has maintained SitePro's proprietary system online and

functional in tandem with its own WaterBridge Clone System, and that WaterBridge has disabled

cameras and taken other measures to hide its activities with the SitePro proprietary system,

confirms that WaterBridge is using SitePro's proprietary system to troubleshoot, repair, improve and "sandbox" the WaterBridge Clone System.   On information and belief, WaterBridge has maintained SitePro's proprietary system at other EVX facilities in a similar manner and for a similar purpose as the EVX Bronco SWD facility.  Indeed, WaterBridge has not terminated any of the EVX / SitePro contracts so it can continue to add authorized users and access the SitePro property system for the purpose of using SitePro's trade secrets for its own improper and unlawful purposes.

70. Indeed, in 2020, in a conversation with SitePro founder Aaron Phillips, WaterBridge's Charles Lame admitted that he doubted WaterBridge's own technology would ever be as good SitePro's technology.  That admission confirms WaterBridge's unlawful motive for continuing its unauthorized access and use of SitePro's proprietary system.

71.   On information and belief, TIGA provided additional assistance to WaterBridge in converting the EVX SWD facility sites from SitePro to TIGA, and in also accessing and making unauthorized use of the SitePro Proprietary systems running on the EVX SWD facility sites.

**SitePro Trade Secrets Compromised by WaterBridge and TIGA**

72.   Through its unlawful actions, including but not limited to as discussed in this Complaint, WaterBridge and TIGA have misappropriated significant trade secrets owned by SitePro.  Below is a high-level description of some of the trade secrets that WaterBridge and TIGA have misappropriated.  This list is for exemplary purposes and does not limit the number of trade secrets at issue in this lawsuit.

(a)   <u>Camera Configuration</u> -- SitePro has developed a novel approach to configuring the cameras in its system to align and sync live monitoring and events such as alarms and truck ticketing.  This trade secret information was available only through authorized user access of SitePro's Industrial PC or Web platform.

26

(b)    <u>Control Narrative</u> (including Sensor Equations; Alarm logic, actuator control; alert set points, and certain control functionalities (meters, etc.).  Through its experience, SitePro has developed specific settings, data flow, equations and data structure (collectively referred to as the Control Narrative) that enable real-time monitoring and variable control.  This trade secret information was available only through authorized user access of SitePro's Industrial PC or Web platform.

(c)    <u>Meter Information</u> -- SitePro developed a novel approach to the way a water-gathering system builds its customers, and created unique ways to summarize and manage the volumes and flow direction in a real-time, remote-control system throughout a complex network of pipes carrying the fluids.   In addition, SitePro developed a novel approach that incorporated ticketing data from truck deliveries into this same information.   This trade secret information was available only through authorized user access of SitePro's Industrial PC or Web platform.

(d)    <u>Data entry for ticketing</u> -- SitePro developed a unique electronic entry system for truck ticketing entry at the point of delivery that automated the collection of such data and additionally improved and allowed for more efficient error identification and correction.  This trade secret information was available only through authorized user access of SitePro's Industrial PC or Web platform.

(e)    <u>Ticket Reconciliation System</u> -- SitePro developed a unique approach for reconciling a customer's electronic tickets with its accounting software while identifying the tickets and invoices that need attention, and also pulling in the necessary regulatory reports.  This trade secret information was available only through authorized user access of SitePro's Industrial PC or Web platform.

(f)     <u>Optimal Parameters and Set Points.</u>   Through its years of experience, SitePro has developed optimal initial settings and operational parameters, plus additional safeguards, for facility equipment such as valves, pumps, actuators and sensors.  This trade secret information was available only through authorized user access of SitePro's Industrial PC or Web platform.

(g)     <u>Throttle Valve</u> -- Through its experience, SitePro developed a unique approach to regulating fluid flow without having to stop and start the main pumps, which allows for fine tuning of the system and reduces equipment wear.  This trade secret information was available only through authorized user access of SitePro's Industrial PC or Web platform.

(h)     <u>Data capture, structure and algorithms</u> -- Through its experience, SitePro developed significant proprietary knowledge regarding what data to capture, how to capture the data, how to group and sort the data, how to maintain it, and how to use that data via analytics algorithms to manage and control a facility site.  This trade secret information was available only through authorized user access to SitePro's Industrial PC or Web platform.

(i)     <u>Camera Streaming</u> -- SitePro developed a unique way of streaming cameras for use in real-time monitoring and control.  This trade secret information was available only through authorized user access of SitePro's Industrial PC or Web platform.

(j)     <u>Field data capture</u> -- SitePro developed a unique way for customers using their mobile application to capture data from equipment in the field that may not be connected to the system, may be without power, or whose sensors may be malfunctioning, and have that data flow into the SitePro proprietary system.  This trade secret information was available only through authorized user access of SitePro's Mobile App or Web platform.

(k)     <u>Pre-configuration in System Architecture</u> -- SitePro developed a unique system that provides context to the nodes and equipment that are added a facility to preconfigure them so that its customers may build and expand their system faster and more efficiently. This trade secret information was available only through authorized user access of SitePro's Industrial PC or Web platform.

(l)     <u>Mobile application</u> -- SitePro developed a unique mobile application for its SitePro proprietary system, the development of which included significant trial and error and improvement over time.   SitePro developed significant proprietary knowhow regarding the development and use of its mobile application. This trade secret information was available only through authorized user access of SitePro's mobile app.

## **COUNT I**

### **Misappropriation of Trade Secrets Under Federal Law**

73.  SitePro repeats and realleges, as if fully set forth herein, the allegations set forth in the foregoing paragraphs this Complaint.

74.  SitePro's trade secrets, as noted above, contained significant and critical confidential and proprietary information relating to SitePro's business that was not known in the industry.   Such trade secret information was exclusively SitePro's property and not the subject of any technology owned, retained or licensed-back from WaterBridge.

75.  SitePro's trade secrets described in the preceding paragraphs constitutes "trade secrets" as defined 18 U.S.C. § 1839(3).  Among other things, these SitePro trade secrets constitute "financial, business, technical, [and/or] economic" information.

76.  SitePro has taken reasonable precautions to protect and maintain the value of its trade secrets, as described above.

77.   SitePro's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, competitors who can obtain economic value from the disclosure or use of the information.   For example, these trade secrets have been used to develop SitePro's proprietary system, which significantly advanced the state-of-the-art in fluid analytics, monitoring and control.  SitePro's proprietary system was developed and released years before the Ignition software was available for companies like TIGA and WaterBridge to implement.

78.   In violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, WaterBridge and TIGA misappropriated SitePro's trade secrets.  Specifically, WaterBridge and TIGA SitePro's trade secrets through improper means, and via at least the theft of and breach of contractual duties to owed to SitePro.  WaterBridge and TIGA continued to access SitePro's trade secrets through improper means by access and use of SitePro's proprietary system at the EVX facility sites.

79.   WaterBridge and TIGA further misappropriated SitePro's trade secrets by their unauthorized use and disclosure of SitePro's trade secrets for the development, implementation, testing, troubleshooting and continued refinement of the WaterBridge Clone System at both WaterBridge and EVX facilities.   Such use and disclosure constitute misappropriation under the DTSA.

80.   WaterBridge and TIGA misappropriated SitePro's trade secrets after May 11, 2016, the effective date of the DTSA.

81.   WaterBridge and TIGA knew or had reason to know that they acquired knowledge of the trade secrets under circumstances giving rise to a duty to maintain the secrecy of the trade

secrets and/or to limit their use (i.e., in the course WaterBridge's contractual relationship with SitePro).  *See* 18 U.S.C. § 1839(5) (defining misappropriation of trade secrets).

82.   WaterBridge and TIGA misappropriation impacts and affects interstate commerce because their illegal actions have taken place in Texas and Oklahoma at WaterBridge's facility sites in both states.

83.   SitePro has suffered and will continue to suffer injury as alleged above as a direct and proximate result of WaterBridge and TIGA's willful misappropriation of SitePro's trade secrets.   As a direct and proximate cause of WaterBridge and TIGA's misappropriation of SitePro's confidential and proprietary trade secrets, WaterBridge and TIGA have been unjustly enriched and SitePro has sustained damages in an amount to be proven at trial.   In lieu of damages measured by any other methods, SitePro shall be entitled to a reasonable royalty for WaterBridge and TIGA's misappropriation of SitePro's trade secrets.

84.   WaterBridge and TIGA knew or should have known that their unauthorized access to SitePro's trade secrets was illegal, and their misappropriation of those trade secrets has been willful and malicious, entitling SitePro to an award of exemplary damages under the DTSA.

85.   SitePro is also entitled to an award of its reasonable attorney's fees under the DTSA because WaterBridge and TIGA willfully and maliciously misappropriated SitePro's trade secrets.

86.   WaterBridge and TIGA's wrongful use of SitePro's trade secrets has caused SitePro irreparable injury, and barring a preliminary and permanent injunction against further use or disclosure of SitePro's trade secrets or other equitable relief by this Court, such irreparable injury will continue.

## COUNT II

### Misappropriation of Trade Secrets Under Texas State Law

87.   SitePro repeats and realleges as is fully set forth herein, the allegations set forth in the foregoing paragraphs of this Complaint.

88.   Defendant WaterBridge and TIGA's misappropriation of trade secrets, as set forth in the preceding paragraphs, also violates the Texas Uniform Trade Secrets Act (Chapter 134A of the Texas Civil Practice and Remedies Code, or "TUTSA").   As set forth above, SitePro's trade secrets information constitutes "trade secrets" under TUTSA, including proprietary formulas, patterns, compilations, programs, devices, methods, techniques and processes unique to SitePro's audio hardware, software, and subsystems.

89.   As set forth above, SitePro's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, persons and entities in the fluid analytics, monitoring and control market who can obtain economic value from its disclosure or use.

90.   Further, as set forth above, SitePro's trade secrets are the subject of efforts that are reasonable under the circumstances to maintain the secrecy of these trade secrets.

91.   As set forth above, WaterBridge and TIGA's actions constitute misappropriation under the TUTSA through acquisition by improper means, use and disclosure.  WaterBridge and TIGA's illegal conduct, as set forth above, entitles SitePro to an award of damages and preliminary and permanent injunctive relief pursuant to the TUTSA.   SitePro is also entitled to continuing injunctive relief for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.   For example, the development of SitePro's trade secrets regarding its SitePro proprietary system took more than three years, and any injunction against WaterBridge and TIGA should reasonably last that long.

92.   Pursuant to Section 134A.004 of TUTSA, SitePro is entitled to recover damages for WaterBridge and TIGA's misappropriation in addition to injunctive relief.  SitePro's damages include both the actual loss caused by WaterBridge and TIGA's misappropriation that SitePro shall prove at trial, and also the unjust enrichment caused by WaterBridge and TIGA's misappropriation that is not taken into account in computing actual loss.  In lieu of damages measured by any other methods, the damages caused by WaterBridge and TIGA's misappropriation may also be measured by imposition of a reasonable royalty for WaterBridge and TIGA's misappropriation.   In addition, WaterBridge and TIGA's illegal conduct constitutes willful and malicious misappropriation and, therefore, SitePro is entitled to an award exemplary damages.

93.   Further, pursuant to Section 134A.005, SitePro is entitled to an award of its reasonable attorney's fees because WaterBridge and TIGA's conduct constitutes willful and malicious misappropriation.

94.   WaterBridge and TIGA's conduct was also committed with "malice" as defined in Chapter 41 of the Texas Civil Practice and Remedies Code.

95.   In wrongfully and intentionally taking, retaining, and using SitePro's trade secrets as outlined above, WaterBridge and TIGA has demonstrated specific intent to cause substantial injury or harm to SitePro.  WaterBridge and TIGA has committed acts amounting to fraud, malice, and gross negligence.  As such, SitePro requests exemplary damages for all causes of action for which exemplary damages are available pursuant to Texas Civil Practices and Remedies Code Chapter 41 and other applicable Texas law.

## COUNT III

### Breach of Contract

96.   SitePro repeats and realleges, as is fully set forth herein, the allegations set forth in the foregoing paragraphs of this Complaint.

97.  The agreements WaterBridge entered into with SitePro required that WaterBridge safeguard and not make unauthorized use of SitePro confidential information.

98.  SitePro fulfilled its obligations under the agreements and WaterBridge's performance pursuant to these agreements was not excused.

99.  WaterBridge unjustifiably and inexcusably breached his obligations under these agreements by wrongfully accessing and using SitePro's confidential information (including its trade secrets as described above) for the purpose of developing the WaterBridge Clone System. WaterBridge also breached these agreements by disclosing and transferring proprietary and confidential SitePro property and information to TIGA, and by hiding the true nature of TIGA's involvement and access to SitePro's proprietary system.   WaterBridge continued to breach these agreements through its wrongful and illegal actions at the EVX facility sites, as noted above.

100. WaterBridge's continuing and recent actions demonstrate that WaterBridge has used and intends to continue to use and disclose SitePro's confidential information in violation of the agreements.

101. As a result of WaterBridge's breaches, SitePro has suffered and will imminently suffer further harm, including the loss of confidential and proprietary information, competitive position, existing customers, and goodwill. SitePro is entitled to an award of damages for WaterBridge's breach of contract.

102. In addition, these agreements provide that SitePro shall be entitled to enforce WaterBridge's obligations under this agreement by injunction without bond.   The direct threat of continuing breaches by WaterBridge will cause irreparable harm to SitePro, and thus SitePro in entitled to preliminary and permanent injunctive relief against WaterBridge.

103. SitePro has been forced to retain counsel to present claims and demands to WaterBridge through this lawsuit to remedy past breaches and stop future breaches by WaterBridge.   WaterBridge has refused to comply with SitePro's claims and demands to rectify WaterBridge's breach of contract.  SitePro thus is entitled to recover its reasonable attorneys' fees and costs pursuant to Texas Civil Practices and Remedies Code Section 38.001.

## COUNT IV

### Computer Fraud and Abuse Act
(18 U.S.C. § 1030)

104. SitePro repeats and realleges, as is fully set forth herein, the allegations set forth in the foregoing paragraphs of this Complaint.

105. WaterBridge and TIGA have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, by intentionally accessing SitePro's proprietary system on the Industrial PCs, computers used for interstate commerce or communication, with the improper purpose of making unauthorized use of SitePro's proprietary information and trade secrets residing on those computers, and by obtaining information from such a protected computer, and so causing significant damage.

106. WaterBridge and TIGA have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, by knowingly, and with intent to defraud SitePro through its wrongful actions, by accessing the SitePro proprietary system with an improper purpose, including on the Industrial PCs, a protected computer, exceeding authorized access to such a computer, and, by means of such conduct, furthering its intended fraud and obtained one or more things of value, including, but not

limited to significant and critical confidential and proprietary information relating to SitePro's hardware, software and subsystems.   Such confidential and proprietary information was exclusively SitePro's property, as set forth in the contracts between SitePro and WaterBridge, and not the subject of any technology owned, retained or licensed back to WaterBridge.

107. WaterBridge and TIGA have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, by intentionally accessing SitePro proprietary system, on the Industrial PCs, which are protected computers, beyond the scope of the authorization granted, causing damage to SitePro, recklessly or without due regard for his actions.

108. The SitePro proprietary system, including on the Industrial PCs, that WaterBridge and TIGA accessed as described above constitutes a "protected computer" within the meaning of 18 U.S.C. § 1030.

109.  SitePro has been harmed by these violations, and the harm amounts to over $5,000 aggregated over a one-year period.

110.  WaterBridge and TIGA's unlawful access to, and misappropriations of property and information from SitePro have also caused and will continue to cause SitePro irreparable injury.  Unless restrained and enjoined, WaterBridge and TIGA will continue to commit such acts. Damages are not adequate to compensate SitePro for these actual and threatened injuries, and SitePro is therefore entitled to injunctive relief as provided by 18 U.S.C. § 1030(g).

## COUNT V

### Civil Conspiracy

111. SitePro repeats and realleges, as is fully set forth herein, the allegations set forth in the foregoing paragraphs of this Complaint.

112. WaterBridge and TIGA are two, separate entities.

113. WaterBridge and TIGA conspired to misappropriate, steal, and use for their unlawful gain, SitePro's trade secret information. To this end, WaterBridge and TIGA knew and agreed that they could not accomplish the misappropriation, theft, and misuse without their collective actions.

114. WaterBridge and TIGA had a meeting of the minds, a shared commitment to their conspiratorial undertakings. In fact, they secreted the actual purpose for TIGA's access to SitePro's proprietary system to the furtherance of their conspiracy. Their conspiracy benefited WaterBridge and TIGA, for their collective purposes and benefits, as described above.

115. In furtherance of the conspiracy, WaterBridge and TIGA undoubtedly communicated by telephone, text, email, and through in-person meetings to determine what actions to take and what SitePro confidential information and trade secrets to target, and how to acquire and use that information to develop, test, troubleshoot and improve the WaterBridge Clone System . 109.

116. Additionally, WaterBridge and TIGA advanced the conspiracy by, inter alia, (a) accessing SitePro's trade secrets by unauthorized access to the SitePro proprietary system, and other means made available through the deception of SitePro, (b) misappropriating and stealing the accessed information, (c) converting EVX facility sites using the information unlawfully pilfered, and (c) converting EVX to WaterBridge.

117. The conspiracy has caused SitePro damages. SitePro has suffered actual damages because of WaterBridge and TIGA's conspiratorial undertaking, including lost business and costs incurred to try and replace business lost to the conspiracy. The amount of these damages will be determined at trial.

118. WaterBridge and TIGA are jointly and severally liable for the damages they have caused SitePro through the conspiracy.

## COUNT VI

### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

119. SitePro repeats and realleges, as is fully set forth herein, the allegations set forth in the foregoing paragraphs of this Complaint.

120. SitePro and EVX had numerous written contracts.

121. Each of these agreements was active at the time of WaterBridge's actions, as noted above.

122. WaterBridge knew well of the SitePro / EVX contracts, and even requested them from WaterBridge.

123. WaterBridge willfully and intentionally interfered with the SitePro/EVX contracts with full knowledge that EVX was under contract SitePro.

124. WaterBridge's interference has injured SitePro. The interference led to the conversion of the EVX facilities from the SitePro proprietary system to the WaterBridge Clone System, and for the misuse of the SitePro proprietary system existing and maintained on the EVX facilities to troubleshoot, test and improve the WaterBridge Clone System in violation of the EVX contracts.

125. SitePro has suffered actual damages because of WaterBridge's interference with contract, including lost business and costs incurred to try repair its contractual relations with EVX disrupted through interference. The amount of these damages will be determined at trial.

### PRELIMINARY AND PERMANENT INJUNCTION

126. SitePro repeats and realleges, as is fully set forth herein, the allegations set forth in the foregoing paragraphs of this Complaint.

127. SitePro intends to seek expedited discovery and pursue a motion for preliminary injunction seeking at least the following immediate relief during the pendency of the lawsuit:

    (a)    Prohibiting WaterBridge and TIGA from using the WaterBridge Cloned System on any EVX facility sites, or any third-party sites;

    (b)    Prohibiting WaterBridge and TIGA from continued access to any SitePro proprietary system; and

    (c)    Requiring written certification by WaterBridge and TIGA that they have retained no documents, computer media, storage media, or files containing SitePro confidential information.

128. SitePro also seeks a permanent injunction incorporating the relief sought above on a preliminary basis, and further (a) barring Defendant WaterBridge from competing with SitePro; (b) barring WaterBridge and TIGA from disclosing and/or using SitePro's trade secrets; and (c) providing for all additional restrictions necessary to protect SitePro from the harm likely to result from Defendant WaterBridge and TIGA's continued wrongful conduct.

129. Preliminary and permanent injunctive relief against WaterBridge and TIGA is appropriate because, as SitePro will demonstrate through separate motion and briefing:

    (a)    Defendant WaterBridge and TIGA's conduct has caused and will continue to cause irreparable injury to SitePro;

    (b)    monetary damages will be inadequate to remedy the injury;

    (c)    an injunction is warranted considering the balance of hardships between the parties; and

    (d)    issuing the injunction would not disserve the public interest.

*Abraham v. Alpha Chi Omega*, 708 F.3d 614, 627 (5th Cir. 2013) (citing *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

## JURY DEMAND

130.    SitePro demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff SitePro demands judgment seeking relief against WaterBridge

and TIGA as follows:

(a)     For judgment in favor of SitePro and against WaterBridge and TIGA;

(b)     For a preliminary and permanent injunction barring further use or disclosure of SitePro's proprietary and confidential information, and for other relief set forth above;

(c)     For an order requiring WaterBridge and TIGA to account for and pay to SitePro all ill-gotten gains, profits and savings obtained or derived from his improper conduct;

(d)     For damages to be proven at trial;

(e)     For exemplary and punitive damages as allowed by applicable statutes;

(f)     For restitution and disgorgement of all ill-gotten gains unjustly obtained and retained by WaterBridge and TIGA through the acts complained of herein;

(g)     For pre-judgment and post-judgment interest as allowed by law;

(h)     For an Order awarding SitePro its attorneys' fees and all costs of suit incurred herein; and

(i)     such other and further relief as the Court deems just and equitable.

Dated:  February 13, 2023

Respectfully submitted,

/s/ *M. Craig Tyler*

M. Craig Tyler
Texas State Bar No. 00794762
CTyler@perkinscoie.com

Dakota Kanetzky
Texas State Bar No. 24116599
DKanetzky@perkinscoie.com
PERKINS COIE LLP
500 W 2nd St 1900
Austin, TX 78701
Telephone: (737) 256-6100

Heather C. Martin
(*Pro Hac Vice* to be submitted)
HeatherMartin@perkinscoie.com
PERKINS COIE LLP
700 13th Street, NW
Suite 800
Washington, D.C. 20005-3960
Telephone: (20) 654-6200

*Attorneys for Plaintiff*
*SitePro, Inc.*

JS 44 (Rev 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| SitePro, Inc. | WaterBridge Resources, LLC, WaterBridge Operating, LLC, WaterBridge Holdings, LLC, WaterBridge Management, Inc., and The Integration Group of the Americas |

**(b)** County of Residence of First Listed Plaintiff    Lubbock
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Harris
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
M. Craig Tyler, PERKINS COIE LLP, 500 W 2nd St 1900 Austin, TX 78701, (737) 256-6100

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U S Government Plaintiff
- [ ] 2 U S Government Defendant
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal | [ ] 376 Qui Tam (31 USC |
| [ ] 130 Miller Act | [ ] 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| [ ] 140 Negotiable Instrument | Liability | [ ] 367 Health Care/ | | **INTELLECTUAL** | [ ] 400 State Reapportionment |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' | Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted | Liability | [ ] 368 Asbestos Personal | | [ ] 835 Patent - Abbreviated | [ ] 460 Deportation |
| Student Loans | [ ] 340 Marine | Injury Product | | New Drug Application | [ ] 470 Racketeer Influenced and |
| (Excludes Veterans) | [ ] 345 Marine Product | Liability | | [ ] 840 Trademark | Corrupt Organizations |
| [ ] 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | [x] 880 Defend Trade Secrets | [ ] 480 Consumer Credit |
| of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle | [ ] 371 Truth in Lending | Act | | [ ] 485 Telephone Consumer |
| [ ] 190 Other Contract | Product Liability | [ ] 380 Other Personal | [ ] 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal | Property Damage | Relations | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | Injury | [ ] 385 Property Damage | [ ] 740 Railway Labor Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ |
| | [ ] 362 Personal Injury - | Product Liability | [ ] 751 Family and Medical | [ ] 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | | Leave Act | [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 790 Other Labor Litigation | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | [ ] 791 Employee Retirement | | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate | | [ ] 870 Taxes (U S Plaintiff | Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/ | Sentence | | or Defendant) | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | Accommodations | [ ] 530 General | | [ ] 871 IRS—Third Party | [ ] 899 Administrative Procedure |
| [ ] 290 All Other Real Property | [ ] 445 Amer w/Disabilities - | [ ] 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment | **Other:** | [ ] 462 Naturalization Application | | Agency Decision |
| | [ ] 446 Amer w/Disabilities - | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration | | [ ] 950 Constitutionality of |
| | Other | [ ] 550 Civil Rights | Actions | | State Statutes |
| | [ ] 448 Education | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
18 U.S.C. §§ 1836, 1832; 18 U.S.C. § 1030, 28 U.S.C. § 1331, 28 U.S.C. § 1367
Brief description of cause:
Theft of Trade Secrets and Breach of Contract

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**   $89,157,549

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____ DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 2/13/2023 | /s/ M. Craig Tyler |

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)**    **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)**    **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)**    **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**    **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.  (See Section III below; **NOTE: federal question actions take precedence over diversity cases.)**

**III.**    **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.**    **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

**V.**    **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.**    **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**    **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**    **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.