**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| SITEPRO, INC., | |
| Plaintiff, | |
| v. | **C.A. No. 6:23-cv-00115-ADA-DTG** |
| WATERBRIDGE RESOURCES, LLC, WATERBRIDGE OPERATING, LLC, WATERBRIDGE HOLDINGS, LLC, WATERBRIDGE MANAGEMENT, INC., AND THE INTEGRATION GROUP OF THE AMERICAS, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## FIRST AMENDED COMPLAINT

Plaintiff SitePro, Inc. ("SitePro") files this Complaint against Defendants WaterBridge Resources, LLC, WaterBridge Operating, LLC, WaterBridge Holdings, LLC, WaterBridge Management, Inc. (collectively, "WaterBridge"), and The Integration Group of the Americas ("TIGA"), respectfully alleging as follows:

## NATURE OF DISPUTE

1.  SitePro brings this civil action against WaterBridge and TIGA for the following reasons: (1) WaterBridge breached its agreements with SitePro; (2) WaterBridge and TIGA misappropriated SitePro's trade secrets by improperly acquiring and using SitePro's trade secrets, making unauthorized access and use of SitePro's computer systems, and using such trade secrets and unauthorized computer access to replicate SitePro's technology into WaterBridge's clone analytics, monitoring, and control system; (3) WaterBridge and TIGA, by replicating and using SitePro's technology to create their own cloned SCADA system, infringed, and continue to infringe, multiple U.S. patents owned by SitePro; and (4) WaterBridge violated the Lanham Act,

1

15 U.S.C. §§ 1114 and 1125, *et seq*. and Texas common law when WaterBridge, without authorization, used SitePro's trademarks on its clone analytics, monitoring, and control system, thereby  infringing SitePro's rights and giving a false designation of origin.

2.     SitePro developed a revolutionary, award-winning, proprietary advanced IoT and control platform that allows organizations to monitor, control and analyze critical infrastructure in real-time.  SitePro's system enabled WaterBridge to become wildly successful.  WaterBridge grew from only two saltwater disposal ("SWD") facilities when it began using SitePro's proprietary system to over sixty facilities in four short years.  Then, as is every technology company's worst fear, WaterBridge used its direct access to SitePro's system, including knowledge of SitePro's most valuable trade secrets, to create WaterBridge's own clone system (the "WaterBridge Clone System").  WaterBridge brought in TIGA to replicate SitePro's proprietary system.  WaterBridge and TIGA could have developed an independent system, starting from scratch without using SitePro's intellectual property.  But they did not.  Instead, they accessed and used SitePro's proprietary system (including SitePro's trade secrets) to develop, test, troubleshoot, and refine the WaterBridge Clone System, and WaterBridge continues to this day to access and use SitePro's system to troubleshoot and refine the WaterBridge Clone System.

3.     This lawsuit demonstrates why there must be intellectual property laws, and why the United States legal system must protect those intellectual property laws.  Protection of intellectual property has its roots in the very foundation of this country, as the United States Constitution: Article I, Section 8, Clause 8 reads: "[The Congress shall have Power . . . ] To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."  Based on this constitutional foundation, the laws of Texas and the United States provide for the enforcement of

contracts that prohibit the unauthorized use and disclosure of confidential information, as well as the ability to stop and recover for misappropriation of trade secrets, unauthorized access to proprietary computer systems, infringement of patented technology, and false and misleading use of trademarks.  Through this lawsuit, SitePro asserts these laws to stop WaterBridge and TIGA from their illegal conduct and recover damages for the harm WaterBridge and TIGA have caused.

4.    SitePro seeks to enjoin the use by WaterBridge and TIGA of any SitePro intellectual property, trade secrets, confidential information, patented technology, trademarks and proprietary developments; to recover its misappropriated trade secrets, confidential information, and proprietary developments; and to recover actual and punitive damages, as well as reasonable attorneys' fees.

## THE PARTIES

5.    Plaintiff SitePro, Inc. is a Delaware corporation having its principal place of business at 9502 US-87, Lubbock, TX 79423.  SitePro has an additional place of business located at 1523 E. Sonterra Blvd., San Antonio, TX 78258.

6.    Defendant WaterBridge Resources, LLC (aka "WBR LLC) is a Delaware limited liability company, with its principal place of business at 840 Gessner Rd., Ste. 100, Houston, TX 77024.  WaterBridge Resources LLC is the parent company of Arkoma Water Resources LLC, EnWater Solutions, LLC, WaterBridge Midstream Operating LLC, WaterBridge Texas Midstream LLC, and WaterBridge Operating LLC.  WaterBridge Resources LLC may be served through its registered agent, Capital Services, Inc., 108 Lakeland Ave., Dover, DE 19901.

7.    Defendant WaterBridge Operating, LLC, a Delaware limited liability company, is a subsidiary of WaterBridge Resources, with its registered principal place of business at 820 Gessner Rd., Ste. 650, Houston, TX 77024.  WaterBridge Operating, LLC may be served through its registered agent, Capital Services, Inc., 108 Lakeland Ave., Dover, DE 19901.

8.    Defendants WaterBridge Operating, LLC and WaterBridge Resources, LLC operate collectively as WaterBridge, along with other affiliated companies.  WaterBridge also has a corporate headquarters at 5555 San Felipe; Ste. 1200, Houston, TX 77056; with the following West Texas and Oklahoma offices: Midland Office: 303 West Wall Street; Ste. 700, Midland, TX 79701; Pecos Field Office: 5 CR 131, Pecos, TX 79772; Abilene Office: 1025 Oak St., Abilene, TX 79602; and McAlester Field Office; 1501 E. Pierce Ave, McAlester, OK 74501.

9.    Defendant WaterBridge Holdings, LLC, a Delaware limited liability company, is a parent of WaterBridge Resources, with its principal place of business at 820 Gessner Rd., Ste. 650, Houston, TX 77024.  WaterBridge Holdings LLC may be served through its registered agent, Capital Services, Inc., 108 Lakeland Ave., Dover, DE 19901.

10.    Defendant WaterBridge Management, Inc., a Delaware limited liability company, is a parent of WaterBridge Resources, with its principal place of business at 820 Gessner Rd., Ste. 650, Houston, TX 77024.  WaterBridge Management, Inc. may be served through its registered agent, Capital Services, Inc., 108 Lakeland Ave., Dover, DE 19901.

11.    Defendant TIGA is a Texas corporation and is a subsidiary of Tetra Tech, Inc., and has a registered principal place of business at 1790 Hughes Landing Blvd, Ste. 400, The Woodlands, TX 77380-1691.  TIGA also has a place of business at 25700 I-45 N, Ste. 480, Spring, TX 77381, and has its West Texas Local Service Facility at 4883 S, TX-464 Loop, Monahans, TX 79756.  TIGA may be served via its register agent, CT Corporation System, at 1999 Bryan St. Suite 900, Dallas, TX 75201-3136.

12.    A substantial part of the events giving rise to SitePro's causes of action as alleged herein occurred in the Western District of Texas and have a direct effect on SitePro in the Western District of Texas.  SitePro identified the involved WaterBridge entities to the best of its ability;

however, there are multiple WaterBridge entities registered in both Delaware and Texas and the corporate structure is difficult to discern.

## JURISDICTION AND VENUE

13.  This Court has original jurisdiction of this action pursuant to the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq* and 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over the pendant state law claims asserted herein, pursuant to 28 U.S.C. § 1367.  These claims derive from a common nucleus of operative facts and are so related that they form part of the same case or controversy.

14.  This Court also has original jurisdiction of this action pursuant to the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 and 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over the pendant state law claims asserted herein, pursuant to 28 U.S.C. § 1367.  These claims derive from a common nucleus of operative facts and are so related that they form part of the same case or controversy.

15.  This Court also has original jurisdiction of this action pursuant to 15 U.S.C. § 1121(a) (SitePro's Lanham Act Claims, as set forth herein) and 28 U.S.C. § 1338 (SitePro's patent infringement claims, as set forth herein).

16.  The Court also has jurisdiction over this action by virtue of the agreements at issue in this case between SitePro and WaterBridge that state, "[a]ny legal suit, action or proceeding arising out of or relating to this Agreement may be instituted in the federal courts of the United States of America or the courts of the State of Texas, and each party irrevocably submits to the jurisdiction of such courts in any such suit, action or proceeding."

17.  Venue is appropriate in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, including but not limited to, the following: the SWD facilities at which SitePro

provided services to WaterBridge are in this judicial district, the SWD facilities at which WaterBridge and TIGA made unauthorized use of SitePro's system, and accessed that system for an inappropriate and unlawful purpose, (the system including its trade secrets and confidential information), many of the meetings between SitePro and WaterBridge at which the agreements at issue in this litigation occurred at WaterBridge's offices and SWD facilities within this judicial district, and the ongoing misappropriation of SitePro's trade secrets has occurred and continues to occur at SWD and oil and gas facilities located throughout this judicial district.  Further, the great majority, if not all, actions and events set forth in this Complaint occurred within this judicial district.

18.  Venue is appropriate in this judicial district under 28 U.S.C. § 1400(b) because Defendants have committed acts of infringement in, and maintain regular and established places of business in, this district as set forth above, including, e.g., Defendants WaterBridge Operating, LLC and WaterBridge Resources, LLC's Midland office at 303 West Wall Street, Ste.700, Midland, TX 79701, and Defendant TIGA's West Texas Local Service Facility at 4883 S, TX-464 Loop, Monahans, TX 79756.

19.  This Court has personal jurisdiction over Defendants because they are doing business in the State of Texas. WaterBridge and TIGA have advertised, promoted, offered for sale, sold and/or distributed and continues to advertise, promote, offer for sale, sell, and/or distribute infringing products to customers and potential customers in this judicial district.  SitePro, its customers, and its potential customers reside in the State of Texas, including in this judicial district and therefore Defendants' acts giving rise to this lawsuit and the harm SitePro has suffered have both occurred in this judicial district.

## GENERAL ALLEGATIONS

### SitePro's Business Activities, Trade Secrets, Trademarks, Patents, and Other Confidential and Proprietary Information and Technology

20. For more than a decade, SitePro has been at the forefront of data analytics, monitoring, and control of fluids in the energy (SWD and Oil&Gas), municipal, and agriculture industries. SitePro initially sought to enable the digital oil field. From there, it evolved its technology for use in the municipal and agriculture industries. SitePro focuses on developing market-leading software and hardware products that deliver easy-to-use, scalable fluid analytics, monitoring, and control. SitePro has developed and continues to develop state-of-the-art, award-winning software products, hardware, and equipment. SitePro combines an integrated, best-in-class cloud-based software as a service (SaaS) and mobile application. Both SitePro's software and hardware products and cloud services are vital to SitePro and its customers' businesses.

21. SitePro began as AmpliSine Labs, LLC, which was founded in November 2009 by Aaron Phillips. David Bateman joined Aaron in 2011, and the first year of revenue was 2012. Bateman and Phillips both graduated from Texas Tech with engineering degrees. Bateman graduated in 2008 with an Industrial Engineering degree and earned an MBA in 2012. In 2019, Hart Energy featured Bateman as one of its Forty Under 40 honorees. Phillips graduated in 2007 with his Industrial Engineering degree and earned a Masters in 2008. After completing all Ph.D. coursework and dissertation, Phillips started AmpliSine Labs to patent and commercialize his work instead of defending his dissertation. The company was founded to focus on reimagining control and management systems in the underserved SWD market, which in 2011 was a process-intensive business with limited viable software options outside of expensive traditional SCADA systems. In 2014, Phillips received the Texas Tech College of Engineering Entrepreneur of the Year Award

as President and CEO of AmpliSine Labs.  AmpliSine Labs changed its name to SitePro, LLC (Texas entity) in July 2018 and then ultimately to SitePro, Inc. effective January 1, 2019.

22.  In launching their company, Bateman and Phillips first explored using existing SCADA systems but quickly determined that the then state-of-the-art SCADA systems were inadequate for the SWD industry and the problems facing their potential SWD customers.  So, Phillips and Bateman developed their own proprietary system from scratch.

23.  Traditional oil field control systems had an automation system that was installed onsite to control the equipment on that site, including pumps, valves, actuators, etc., while also gathering data from sensors within the system or input from individuals at the site.  Then there would be a SCADA system that allowed access to that data from a web-based platform.

24. SitePro's system was (and is) unique and went well beyond these traditional systems in developing proprietary technology that combined the onsite automation system with the web-based control platform in one application.  SitePro became the missing link in oilfield digital fluid logistics.   For example, SitePro's proprietary system features a "no-code" configuration module, advanced ticketing capabilities, and real-time integrated mapping and visualization never previously offered or envisioned by traditional SCADA systems.  SitePro later departed from the physical server setup used by traditional systems at the time, and instead built its new platform on Microsoft's Azure cloud.  SitePro's proprietary system monitors tank levels, volumes, pressures, flow rates, and many other data points in real-time.  It allows organizations to control pumps and valves right from a smartphone or a computer.  SitePro's system is robust and comprehensive, covering real-time data analytics, truck ticketing transactions, and remote management of multiple sites (like an SWD facility) remotely from an office in a large city. SitePro's system also offered scalability well-beyond traditional SCADA systems by pre-

programing and creating new parameters for certain nodes and equipment commonly found in a SWD system so that customers (regardless of technical aptitude/familiarity) could quickly and safely add, remove, edit and control equipment, such as actuators, pumps, valves, and sensors. SitePro additionally developed a mobile application so that its customers could access data, collect data, and control equipment from their mobile devices.  In fact, SitePro's proprietary system enabled a sensor reading to be delivered to a user's browser or mobile application less than one second after it was taken in the field.

25.   SitePro markets and sells these products and services to customers across the nation all under the SITEPRO trademark.  SitePro owns the following U.S. Trademark registration and application ("SITEPRO Registered Mark") in connection with its goods and services:

| Mark | Reg. No | Reg. Date | Goods & Services (in relevance part) / First Use in U.S. Commerce |
|------|---------|-----------|------------------------------------------------------------------|
| SITEPRO | 4376259 | July 30, 2013 | Automation software, namely software to remotely monitor, control, optimize, track problems and generate production reports for fluid based systems, oil and gas production, wireless networks, and industrial systems (June 1, 2012) |

26.   Pursuant to Section 7(b) of the Lanham Act, 15 U.S.C. § 1057(b), SitePro's federal registration certificates for marks on the Principal Register are *prima facie* evidence of the validity of these marks as well as SitePro's ownership and exclusive right to use these marks in connection with the identified goods and services.

27.   Additionally, this registration has achieved incontestable status under 15 U.S.C. § 1065.

28.   For more than a decade, SitePro has also acquired rights to and continuously used in interstate commerce the designation SITECONTROL, INSITE, SITEWATCH, and SITETICKET in connection with its automation solution.

29.   SitePro consistently and prominently uses and displays the SITEPRO Registered Mark and SITECONTROL, INSITE, SITEWATCH, and SITETICKET marks (collectively, the "SITEPRO Marks") in connection with advertising, promotion, and sale of its goods and services and to distinguish them from products and services offered by others.  SitePro has accomplished this by using the SITEPRO Marks in its advertising, brochures, website, other marketing materials, and on its hardware and software.

30.   SitePro invested substantial time, money and resources promoting and marketing its products and services through the use of the SITEPRO Marks on its website and through social media platforms such as Facebook, Instagram, Twitter, and YouTube.  Owing to SitePro's promotional, advertising, and marketing efforts over these many years, the SITEPRO Marks have become known throughout the United States, including in Texas, as an identifier of SitePro's products and services.

31.  SitePro has invested significant time, funds, and effort toward developing, marketing, and commercializing its SITEPRO Marks and toward establishing those marks as a source identifier.  As a result, the consuming public has come to know, rely upon, and recognize SitePro as the exclusive source of SITEPRO products and SITECONTROL, INSITE, SITEWATCH, and SITETICKET services and the high quality associated with SitePro's related automation solutions.  SitePro is a reputable name, and SitePro has built strong goodwill in the SITEPRO Marks.  Thus, SitePro is entitled to protection under Federal and Texas laws.

32.   Moreover, through widespread industry acceptance and recognition, the consuming public and the trade have come to recognize SITEPRO Marks as identifying a single source of high-quality goods and services—namely, SitePro.   In this sense, the SITEPRO Marks have acquired distinctiveness, or "secondary meaning," in that customers have come to view the SITEPRO Marks as a source identifier for SitePro.

33.   The SITEPRO Marks are an asset of incalculable value as a symbol of SitePro, its quality products and services, and its goodwill.

34.   SitePro is informed and believes that Defendants have known about SITEPRO Marks as early as May 2015.

35.   SitePro was also awarded multiple United States patents for its inventions in many technical areas including edge computing, protocol translation (e.g., in which a remote server speaks a single universal language to monitor and control systems in the field, and local "site master controllers" translate those commands in the universal language to device-specific protocols, like Modbus, USB, etc.), and multi-tenant SaaS systems for monitoring and controlling fluid-handling equipment.

36.   SitePro owns the entire right, title, and interest in and to each of the following patents, including the right to seek damages for past and ongoing infringement: U.S. Patent Nos. 8,649,909 (the "'909 Patent"), 9,342,078 (the "'078 Patent"), 9,898,014 (the "'014 Patent"), 10,488,871 (the "'871 Patent"), 11,175,680 (the "'680 Patent"), and 11,294,403 (the "'403 Patent") (collectively, the "SitePro Patents").   SitePro also owns many other patents and patent applications that are not asserted in this case at this time.

37.   The '909 Patent issued on February 11, 2014.  A true and correct copy of this patent is attached hereto as Exhibit A.

38.  The '078 Patent issued on May 17, 2016.  A true and correct copy of this patent is attached hereto as Exhibit B.

39.  The '014 Patent issued on February 20, 2018.  A true and correct copy of this patent is attached hereto as Exhibit C.

40.  The '871 Patent issued on November 26, 2019.  A true and correct copy of this patent is attached hereto as Exhibit D.

41.  The '680 Patent issued on November 16, 2021.  A true and correct copy of this patent is attached hereto as Exhibit E.

42.  The '403 Patent issued on April 5, 2022.  A true and correct copy of this patent is attached hereto as Exhibit F.

43.  The named inventor of each of the SitePro Patents is Aaron Phillips.  The title of each of the SitePro Patents is "Remote control of fluid-handling devices."

44.  SitePro has complied with the marking requirements of 35 U.S.C. § 287 and that statute does not preclude the recovery of pre-suit damages at least because there are no unmarked patented articles subject to a duty to mark.

45.  In addition, SitePro has maintained other inventions and know-how it has developed as its proprietary confidential trade secrets, as set forth below.

46.  SitePro's revolutionary, proprietary technology has been recognized and awarded in industry.  In 2019, Inc. Magazine named SitePro one of the 500 fastest-growing companies in America.  In 2019, CIOReview named SitePro one of the Top 10 Most Promising Oil and Gas Services Companies and, in 2022, CIOReview named SitePro one of the Top 20 Most Promising Energy Tech Solutions Providers.  In September 2022, SitePro was honored with a "TechConnect Defense Innovation Award."  Companies from across the country showcased their technology at

the TechConnect Defense Innovation Summit & Expo, which was judged in collaboration with various United States government entities such as the Department of Defense, Homeland Security, Army, Navy, and Air Force.  Only the highest-ranking technologies were selected for Innovation Awards.  SitePro's technology was awarded for the "potential positive impact the submitted technology will have for the warfighter and national security."  SitePro's software won in the category of Energy, Infrastructure, and Resilience.

47. SitePro's proprietary control platform and system prioritizes transparency, scalability, and security; it puts the power over critical infrastructure management directly in the hands of operators while identifying and deflecting attacks, ensuring the continued protection of our world's most critical resources.  Customers of SitePro's sophisticated proprietary system include small and mid-sized businesses as well as large enterprises all over the country, including leaders in energy (SWD and Oil & Gas), municipal and agriculture industries.

48. Having developed its business and well-earned reputation for quality since 2011, SitePro has grown its business to more than 55 employees and 113 customers.

49. SitePro's success is based on the knowledge, know-how, creativity, and testing that make up its confidential and proprietary intellectual property and trade secrets, in combination with its patented technology.  Over the years, SitePro has invested significant resources to develop its products, hardware, software, equipment, and cloud services, and its internal development, documentation, and manuals regarding its products, hardware, equipment, and cloud services.

50. To protect its investment, the development and use of SitePro's analytics, monitoring, and control technology is kept confidential and is subject to strict controls and measures to maintain secrecy and confidentiality.  For instance, SitePro employees are only authorized to use and receive such information after executing non-disclosure agreements.  Those

agreements require that employees not only keep proprietary information confidential, but that they do not disclose, use, or publish proprietary information except in connection with their work for SitePro.  SitePro employees also agree that they will not disclose or publish any material relating to their work at SitePro or which incorporates SitePro's proprietary information absent the written consent of SitePro.

51.  SitePro takes other reasonable steps to protect trade secrets and other confidential proprietary information by protecting its facilities, servers, computers, networks, databases, and communications systems using a variety of physical and electronic security systems, such as access cards, password protected systems, encrypted communications technology, and vendor and employee non-disclosure agreements.

52.  In addition, SitePro's agreements with its customers, like WaterBridge, include specific protection for its trade secrets and confidential information.  SitePro limits and restricts access to its system to its customers and employees.  SitePro also requires that its customers, like WaterBridge, identify a limited number of customer employees to have access to SitePro's proprietary system.

**SitePro's Relationship with WaterBridge**

53.  WaterBridge was founded around 2010 to provide gathering and disposal of produced salt water.  It was originally known as Pelagic Water Systems until 2016, then EnWater Solutions until 2017, then WaterBridge.  It has a network of SWD facilities that are interconnected by large-scale water pipeline infrastructure throughout the southern Delaware Basin in west Texas and the Arkoma Basin in southeastern Oklahoma.

54.  SitePro began its relationship with WaterBridge (then Pelagic Water Systems) in or around May 2015 when SitePro first worked with Pelagic on an SWD site called EasyJet.  This was WaterBridge's (then Pelagic's) second SWD site.  On their first SWD site, WaterBridge

installed a control System from a company called Patriot, which was owned by individuals with whom Jason Long, the CEO of Pelagic, had a prior relationship.  According to Pelagic, the Patriot System performed very poorly.  It was a traditional SCADA system, with intermittent, not continuous, data collection.  It employed basic "if-then" style ladder logic, with no scaling and no buffering.  It had basic "read-out" remote monitoring.  Individual field engineers/pumpers had to go to the site to make changes to command logic at the site.  The server talked "Modbus" via radio to a field of wells, and the field controller talked to fluid controllers via Modbus.  The system had signification communication problems, and WaterBridge's equipment and facility were being compromised.

55.  Quite differently, SitePro's proprietary system used (and uses) a JSON message format plus encryption, and the field controller at the site translates into Modbus so the field controller can command equipment, such as actuators, pumps, valves, or request data from a sensor.  SitePro's proprietary system allowed (and allows) the system to provide context to the field controller instructions.  SitePro's system provided (and provides) continuous, real-time data acquisition and control.  SitePro's proprietary edge-computing technology allowed (and allows) for control and buffering of field equipment even in the absence or loss of radio, Wi-Fi cellular, or other wireless communication links.  SitePro's proprietary system offered (and offers) a mobile platform so that field engineers can access and collect data in real-time, and control equipment from their mobile phones, tablets, or field computers.

56.  For these, and many other reasons, WaterBridge switched its first EasyJet site from Patriot's SCADA system to SitePro's proprietary platform and system.  Over the next four years, WaterBridge implemented SitePro's platform and system on more than sixty new SWD sites. Before SitePro, when WaterBridge used Patriot's SCADA technology, WaterBridge had to deploy

at least five, if not more, workers per site.  Such workers are referred to as facility operators or pumpers.  Using SitePro's proprietary technology, WaterBridge was able to manage as many as five sites with only one pumper.  In addition, through using SitePro's proprietary technology, WaterBridge was able to enjoy significant savings and profits in areas of human resources, truck ticketing, water management, equipment maintenance, equipment replacement, equipment loss, regulation filings, and many other areas.

57.  One of the services developed and offered by SitePro in 2018 was called SitePro Operations Support ("SOS"), which was later named SitePro's Remote Operations Center ("ROC").  The SOS/ROC is located at SitePro's corporate office and provides a 24/7 remote operations support subscription service, with highly trained personnel continuously monitoring, evaluating, and adjusting customer assets from a centralized control room.  WaterBridge implemented the SOS / ROC in this timeframe.  In the fall 2019, WaterBridge requested that SitePro assist WaterBridge in building its own ROC at WaterBridge's own office.  Based on the long relationship that SitePro had with WaterBridge, SitePro assisted WaterBridge in the development of WaterBridge's ROC and the transition of the SitePro system oversight to the WaterBridge ROC.

58.  In 2018, WaterBridge's success, based largely on its use of SitePro's proprietary system, allowed WaterBridge to secure up to $800 million in financing that was used to expand its presence in the Permian Basin of West Texas. https://www.chron.com/business/energy/article/WaterBridge-Resources-secures-800-million-for-13483974.php.  Through this transaction, WaterBridge became a portfolio company of Five Point Energy LLC, founded in 2016 and based in Houston, Texas.

59.   Then in 2019, based on its continued success and expansion enabled by SitePro's technology, WaterBridge raised $345 million of equity capital through Five Point Energy LLC. https://h2obridge.com/news/waterbridge-announces-closing-of-345-million-of-additional-equity-capital-to-fund-strategic-acquisitions/. In 2019, Five Point Energy LLC sold a minority stake in WaterBridge to affiliates of Singapore's sovereign wealth fund, GIC.  The transaction implies an enterprise value of about $2.8 billion for WaterBridge. https://www.reuters.com/article/waterbridge-resources-stake-idUSL4N22T3JP.      WaterBridge could not have obtained such funding, expansion and valuation without its use of SitePro's proprietary system.

60.   WaterBridge's dramatic success, growth, and expansion of WaterBridge was due to its use and reliance on SitePro's proprietary system.  WaterBridge itself touted the importance of SitePro's proprietary system.   For example, WaterBridge's Vice President of Operations, Michael Reitz, noted the importance of SitePro's proprietary system in a promotion for Microsoft's Azure cloud, the cloud services provider chosen by SitePro to host its proprietary system. Reitz noted how the system allowed WaterBridge to build out to its customers' needs and monitor its SWD facilities in real-time.

**SitePro's Contracts with WaterBridge**

61.   SitePro and WaterBridge entered valid and enforceable contracts for each of the WaterBridge sites that implemented SitePro's proprietary system.

62.   Under these contracts, SitePro would perform a variety of services for WaterBridge, and the contracts would set forth those services, e.g.,

> Services. Company shall provide certain services to customer in accordance with the applicable Order and these Terms (the "Services"). As specified in the applicable Order, the Services may consist of one or more of the following: (a) installation services ("Installation Services"); (b) professional services

17

("Professional Services"); (c) software as a service ("SaaS Services"); or (d) managed services ("Managed Services").

63. Thus, WaterBridge and SitePro would agree in the applicable contract for the services that WaterBridge wanted for that particular site.

64. Under these contracts, SitePro would also sell and deliver "Goods," such as computer hardware and other equipment for use in connection with SitePro's propriety system.

65. Because WaterBridge's access to the Services and Goods provided by SitePro would necessarily expose WaterBridge to SitePro's most valuable intellectual property (including trade secrets), SitePro importantly included contractual protections and safeguards for its intellectual property. For example, these contracts included a Confidentiality provision prohibiting WaterBridge's ability to use or disclose SitePro's confidential information for any use other than performance under the contract, e.g.,

> Confidential Information. All non-public, confidential or proprietary information of Company, including, but not limited to, specifications, samples, patterns, designs, plans, drawings, documents, data, business operations, customer lists, pricing, discounts or rebates, disclosed by Company to Customer, whether disclosed orally or disclosed or accessed in written, electronic or other form or media, and whether or not marked, designated or otherwise identified as "confidential," in connection with this Agreement is confidential, solely for the use of performing this Agreement and may not be disclosed or copied unless authorized in advance by Company in writing. Upon Company's request, Customer shall promptly return all documents and other materials received from Company. Company shall be entitled to injunctive relief for any violation of this Section. This Section does not apply to information that is: (a) in the public domain; (b) known to Customer at the time of disclosure; or (c) rightfully obtained by Company on a non-confidential basis from a third party.

66. Plainly, on even a cursory reading of this provision, it should be clear that use and disclosure of SitePro's confidential information, such as the data flow from or operations of SitePro's system for the purpose of building another analytics, monitoring and control system, is a clear violation of this provision.

67.   Moreover, so there would be no question about who owned the relevant intellectual property, SitePro also included a provision in its contracts with WaterBridge that

> Intellectual Property.  All intellectual property rights, including copyrights, patents, patent disclosures and inventions (whether patentable or not), trademarks service marks, trade secrets, knowhow and other confidential information, trade dress, trade names, logos, corporate names and domain names, together with all of the goodwill associated therewith, derivative works and all other rights (collectively, "Intellectual Property Rights") in and to all documents, work product and other materials that are delivered to Customer under this Agreement or prepared by or on behalf of the Company in the course of performing the Services, including any items identified as such in the Order (collectively, the "Work Product") shall be owned by Company. Company hereby grants Customer a limited, non-exclusive, non-transferable, non-sublicensable license under any Intellectual Property Rights of Company that are embodied in any Work Product provided by Company to Customer hereunder to the limited extent necessary to enable Customer to make reasonable use of such Work Product for the duration of the applicable Order. For avoidance of doubt, the foregoing license expressly excludes any software or applications in connection with the Technology Services. Where contemplated by the applicable order for Technology Services, certain software or applications may be made available by Company for use by Customer or its authorized users, as applicable, pursuant to the applicable Technology Services Terms.

68.   In this clause, it is made plain that SitePro owns the intellectual property rights in not only documents, work product and all other materials delivered to WaterBridge, but also such intellectual property materials prepared by or on behalf of WaterBridge in the course of performing the Services under the Agreement.

69.   The above contractual obligations are merely exemplary, as there are additional contractual obligations between SitePro and WaterBridge that WaterBridge has violated.

**WaterBridge's Operation Independence**

70.   In August 2019, WaterBridge hired Charles Lame as its Director of Field Services.  Lame became the main point of contact for SitePro's interactions with WaterBridge. Beginning in late 2019 and early 2020, WaterBridge demanded that SitePro add staff to better support WaterBridge.  In this same period, WaterBridge also discussed with SitePro extending all

of SitePro's contracts for lengthier periods of time in an effort to have SitePro continue to add additional resources and support for WaterBridge, despite WaterBridge knowing that it intended to soon cancel all SitePro contracts and switch all facilities over to its WaterBridge Clone System. In addition, Hayden McEntire, WaterBridge's Manager of Budget and Planning in 2019 and 2020, began to push SitePro to grant him additional clearance and access into SitePro's systems deceptively claiming he desired to simply learn SitePro's methods when hindsight reveals his exploration was more malicious and calculated.   McEntire and Joey Philippi were some of WaterBridge's additional primary points of contact with SitePro, and requested significant access to SitePro confidential information and trade secrets.  On information and belief, Lame, McEntire and Philippi interfaced with TIGA employees for the purposes of identifying and selecting the SitePro trade secrets that WaterBridge sought to copy and implement into the WaterBridge Clone System.

72.    Further, as noted above, WaterBridge requested that SitePro assist WaterBridge in developing its own ROC at WaterBridge's facility to host 24/7 monitoring of the SitePro proprietary system and platform.  Lame, McEntire, Philippi and other WaterBridge employees spent significant time at SitePro's ROC and then the ROC that SitePro developed for WaterBridge at WaterBridge's own facility.   Apparently, in hindsight, WaterBridge actually wanted its own ROC so that it could have 24/7 access to SitePro's proprietary system so that it and TIGA could mimic and copy SitePro's system and trade secrets for its own use in WaterBridge's Clone System, while avoiding SitePro's suspicion or knowledge.

72.    Also, in late 2019 and early 2020, WaterBridge included as authorized users on its SitePro account individuals with the email addresses @tiga.com, listing them as WaterBridge "facility operators" on their listings of authorized users for the SitePro proprietary system.

Unbeknownst to the SitePro team, WaterBridge had hired TIGA, including team lead, Trent Boudreaux, to assess and learn the SitePro proprietary system under the cover of appearing as WaterBridge facilities operators so that WaterBridge and TIGA could develop WaterBridge Clone System based on SitePro's proprietary system. Here again, WaterBridge hid from SitePro its true intent and plans to (mis)use SitePro's proprietary system to develop and build the WaterBridge Clone System.

73. On February 17, 2020, WaterBridge informed SitePro via email that WaterBridge had "decided to move everything onto the ignition platform," switching out all of its SWD sites from SitePro's propriety system to another unnamed platform based on Ignition Software. David Bateman of SitePro expressed his shock at such news and requested an in-person meeting with WaterBridge. The parties had the in-person meeting where WaterBridge explained its reasons for moving on from SitePro, plainly admitting that once WaterBridge reached more than 35 wells using SitePro, it made economic sense for WaterBridge to develop its own monitoring and control software using the Ignition software, and they had hired TIGA to develop and integrate WaterBridge's own monitoring and control software.

74. Over the course of 2020, WaterBridge slowly transitioned its facilities off SitePro's proprietary systems and terminated its contracts with SitePro. Given that SitePro's contracts all included survival clauses that maintained WaterBridge's contractual obligations regarding Confidentiality and Intellectual Property after termination of the contracts, SitePro trusted that WaterBridge had honored and would continue to honor its contractual commitments to not make unauthorized use of SitePro's intellectual property, including its trade secrets and confidential information.

75.   Then in late fall 2020, SitePro received its first indication that WaterBridge had not honored its contractual obligations and had in fact misused and misappropriated SitePro's trade secrets, together with TIGA, to develop the WaterBridge Clone System.  Specifically, on October 1, 2020, WaterBridge issued a press release that WaterBridge's "Project Independence" had won an award.   The press release, captured at https://h2obridge.com/news/waterbridges-project-independence-received-the-2020-firebrand-award-at-the-annual-icc-conference/, went into great detail, and explained WaterBridge and TIGA had implemented an IOT-enabled SCADA system hosted within a Microsoft Azure infrastructure, just like SitePro's proprietary system.  In the press release was a video that included members of TIGA describing the development of the WaterBridge Clone System.  Trent Boudreaux explained that TIGA had worked with WaterBridge to deploy Ignition Edge Panels at 65 SWD facilities using "Industrial PCs," which was a term that David Bateman had personally coined.  The description of the WaterBridge system, as well as the pictures in the video, showed that TIGA and WaterBridge had not developed a new system or implemented an original, different third-party system, but they had instead completely mimicked and copied the functionality and features of SitePro's proprietary system.  The video falsely suggested that WaterBridge's Clone System was the first to implement edge computing concepts for remote control, truck ticketing, data capture and camera management when SitePro's proprietary system had already included that capability for years.  The video further touted WaterBridge's Clone System's ability to provide centralized real-time data, which the SitePro proprietary system had also provided for years.  The video also revealed the WaterBridge Mobile application, shown below.



76.  This WaterBridge mobile app was remarkably similar to SitePro's mobile app, and had obviously been derived from SitePro's mobile app.  Indeed, the video further explained that when navigating to a specific facility, the application would allow the user to see detailed information regarding all of the equipment at the facility, shown below:



77.   Again, remarkably, the information and detail provided on the WaterBridge app was the same, and in the same format, including the tabs being the same and in the same order, as the SitePro mobile application.   It was plain that WaterBridge and TIGA had derived the WaterBridge mobile app from the SitePro mobile app.   Even worse, when the user of the WaterBridge app looked at trends for a particular piece of equipment, the trend selections of 3 days, 7 days, 30 days and custom (as shown below), which were the exact same trends captured and offered in the SitePro app, it was clear that WaterBridge and TIGA had not just copied SitePro's Mobile App, but had also used SitePro's proprietary data flows and structures.



78.   TIGA also published a case study that further confirmed SitePro's worst fears. https://www.tiga.us/case-studies/using-iiot-for-improved-operational-outcomes.   The article confirmed that rather than being WaterBridge's facility operators, TIGA has instead gained access as an authorized WaterBridge user of SitePro's system to perform "a phase one engineering assessment" of the SitePro system and to "define a migration path" to allow WaterBridge to

develop its own system based on SitePro's system.  The article further noted that "TIGA worked with WaterBridge Operating to **_repurpose_** the existing OnLogic IPC ("Industrial PC") at each SWD facility and integrate Ignition Edge Panel for the local HMI." (emphasis added).   These existing OnLogic IPCs included SitePro's proprietary trade secrets.

79.  The article further falsely claimed that WaterBridge and TIGA invented a truck system when the truck system was actually taken from SitePro.  The article stated the following: "TIGA's team developed a process to make the most current Texas RRC Lease and Drilling Permit data available for selection at the Edge devices used for Truck Unloading. Local HMI screens were developed to find and correct missing information on Truck Tickets created at those Edge devices. Using the corrected Truck Ticket information and Metered Piped volumes, TIGA developed a process to allocate Skim Oil Sales and report them on the Texas RRC P18 form. Ignition Edge Panel deployed at each SWD facility is centrally managed from the Enterprise Ignition System in Azure utilizing the Enterprise Application Module."  This is the same truck ticketing system that SitePro had previously developed and implemented, as demonstrated in its platform with its ROC Ticket software that had been in place for years.  SitePro's ROC Ticket is a "done-for-you" service to reconcile a customer's electronic tickets with its accounting software while identifying the tickets and invoices that need attention and also pulling in the necessary regulatory reports.  Indeed, SitePro had posted an overview video on this technology two years prior at https://blog.sitepro.com/resources/blog/oil-and-gas-field-ticket-reconciliation-done-easy.

80.  And there were other tale-tell signs in this article and others that shortly followed showing WaterBridge had not lived up to its contractual promises, and TIGA and WaterBridge had improperly used SitePro's trade secrets to develop the WaterBridge Clone System.

**SitePro's Reaction**

81.    In addition to realizing WaterBridge and TIGA had wrongfully taken its proprietary system, SitePro also faced an economic one-two punch of losing its largest customer at the same time the economy was collapsing under the weight of the COVID pandemic.  SitePro considered suing immediately to protect its rights and intellectual property, but it was also under the heavy weight of COVID and having to downsize to stay in business.  Rather than closing its doors during the pandemic, which SitePro considered, SitePro instead fought to maintain adequate capital by applying for PPP loans, and then sold and leased back its offices to raise money.  Effectively, SitePro mortgaged its house to stay in business and keep its employees on the payroll.

82.    Having lost its largest SWD customer, WaterBridge, SitePro decided to invest its capital and resources into diversifying its customer base.  Over the past two years, SitePro has been successful in those endeavors by winning many new customers in the municipal, oil and gas production and agriculture industries.    Still, WaterBridge's wrongful, illegal and malicious conduct has forever crippled SitePro and removed it from the trajectory it was on.

**WaterBridge Enjoys Great Success with the Illegal Use of SitePro's Intellectual Property**

83.    Since ending its authorized use (but continuing its unauthorized use) of SitePro's proprietary system, WaterBridge has expanded its footprint of facilities.  In 2021, although much of the industry was stymied under the pressures of the COVID pandemic, WaterBridge closed a transaction with Colgate Energy, LLC ("Colgate") to acquire the produced water infrastructure associated with Colgate's recent asset acquisition from Occidental.  The acquired assets included ten water handling facilities and associated water midstream infrastructure with an aggregate handling capacity of approximately 100,000 bpd, as well as approximately 50 miles of produced water pipelines.    Jason Long, Co-Chief Executive Officer and Chief Operating Officer of

WaterBridge, stated: "This transaction further enhances our ability to manage and distribute over two million barrels per day of produced and recycled water across our Permian platform." https://h2obridge.com/news/waterbridge-announces-strategic-acquisition-of-produced-water-assets-and-expanded-dedication-with-colgate-energy-in-the-delaware-basin/.

84. In 2022, WaterBridge closed another deal with Texas Pacific Land Corp that would allow WaterBridge access to over 60,000 acres in Loving and Reeves counties (Delaware Basin) to expand its produced water management and infrastructure operations. https://www.texaspacific.com/investors/news-events/press-releases/detail/135/texas-pacific-land-corporation-and-waterbridge-ndb-llc-form.

85. On information and belief, WaterBridge implemented its WaterBridge Clone System at these new facilities.

**WaterBridge Implements the WaterBridge Clone System on Facilities Owned by SitePro's Customer EVX Midstream**

86. EVX Midstream Partners was formed in 2015. EVX is focused on the development of crude oil, natural gas, and produced water gathering, processing, treating and transportation assets in the Permian Basin, Eagle Ford, and Mid-Continent. EVX first became a SitePro customer in December 2018, and SitePro has since that time entered into contracts with EVX to provide various components of the SitePro proprietary system on twenty-three facility sites. EVX had a SitePro Ops Center subscription at fifteen of these sites. SitePro's contracts with EVX include clauses protecting SitePro's intellectual property, such as those noted above in the WaterBridge contracts.

87. In August 2022, SitePro learned that WaterBridge had begun to convert three of EVX's sites entirely to the WaterBridge Clone System, including ticketing and cameras. EVX had not cancelled its contracts with SitePro but allowed WaterBridge access to these three facilities

without seeking permission from SitePro.  In that same time frame, SitePro was informed that WaterBridge was running the EVX sites.  WaterBridge requested copies of the contracts between EVX and SitePro, requesting them by email stating, "Per our conversation, can you please send over a copy/copies of the service contract(s) between EVX and SitePro."  SitePro provided Site/EVX contracts to WaterBridge.  Neither EVX nor WaterBridge has provided notice of termination of any of the twenty-three EVX/SitePro contracts.

88.   As of January 31, 2023, WaterBridge had deactivated the SitePro proprietary platform at nineteen of the twenty-three EVX facility sites.  The remaining four EVX facility sites still maintained SitePro in an active state, but in different manners.  The EVX Bronco SWD facility had SitePro in an online state but the SitePro proprietary platform did not appear to be operating the site.  The EVX Drifter SWD facility also had SitePro in an online state but again the SitePro proprietary platform was not operating the facility.  In addition, the cameras that feed into the SitePro system were disconnected.  The EVX Firefox SWD facility had SitePro online but did not appear to be operating via SitePro.  Finally, the EVX Lightfoot SWD facility was fully operating on the SitePro proprietary platform.

89.   WaterBridge has implemented its WaterBridge Clone System at these four EVX facility sites but maintained the SITEPRO Marks without SitePro's authorization, which has caused actual customer confusion.  For example, operators have called SitePro when the WaterBridge Clone System disfunctions.   Further, WaterBridge has maintained the SITEPRO Registered Mark on hardware panels, camera systems, truck ticketing systems and other locations of WaterBridge's own facilities, and WaterBridge has also caused EXV to do the same at EVX facilities, causing actual confusion by third parties who have contacted SitePro due to failures or poor performance of the WaterBridge Clone System mistakenly believing that the failures or poor

performance are caused by technology provided by or authorized by SitePro.  WaterBridge has also implemented the SITECONTROL mark for use in its own WaterBridge Clone System, which is viewed by third parties, and causes confusion as to the source of the technology implemented in the WaterBridge Clone System.  Such continued use of the SITEPRO Marks has caused and will cause actual confusion to field technicians, truck drivers, operators and other employees of customers, partners and other third parties who confuse the source of the controlling and monitoring technology with which they are interacting.  Such confusion harms SitePro when problems occur with the WaterBridge Clone System and it is mistakenly believed to be technology provided in part by SitePro or authorized by SitePro.

90.  On information and belief, WaterBridge has also implemented SitePro's other trademarks, such as INSITE, SITEWATCH, and SITETICKET, in conjunction with its WaterBridge Clone System.

91.  Also on January 31, 2023, SitePro learned that WaterBridge was importing disposal ticketing data and other data from WaterBridge's Clone System back into the SitePro proprietary platforms that it had taken offline.  In this way, WaterBridge was able to calibrate and verify data from its own clone system and also run reports that its WaterBridge Clone System may have been unable to run properly or accurately.  Further, in the month of January, EVX added eleven new authorized users on the SitePro proprietary system, most from WaterBridge, which is much more than any other customer in that time period.  Such addition of the large number of authorized users is highly suspect considering that WaterBridge was in the process of converting all the EVX facilities to the WaterBridge Clone System.

92.  By way of further example, in early February 2023, Joey Philippi of WaterBridge was logged into the SitePro proprietary system at the EVX Drifter SWD facility, which was not

operating on the SitePro system, but on information and belief had already implemented the WaterBridge Clone System.   Philippi, while logged into the SitePro "SiteControl" local applications, placed the SitePro control software into DEBUG MODE, causing the API and local SitePro SiteControl software to no longer communicate with SitePro's control center with no alarm.  Mr. Philippi attempted to modify the COM port settings of the local Industrial PC and software, as well as attempting to make many other changes to the SitePro local applications. Given that the SitePro proprietary system was not operating the Drifter SWD facility, there would be no legitimate reason for WaterBridge to be attempting to make such changes other than to troubleshoot, check and validate its own WaterBridge Clone System that is also active at the EVX Drifter SWD facility.  Such access and usage of the SitePro proprietary system was not authorized by SitePro.   On information and belief, WaterBridge employees have many additional unauthorized uses of SitePro's proprietary system at other EVX facility sites.

93. Also, in early February 2023, SitePro confirmed that WaterBridge had its WaterBridge Clone System running at the EVX Bronco SWD facility, at which facility SitePro was still online but not running the facility.  Inspection of the equipment at that location confirms the integration of SitePro's digital and analog controls and logic into the WaterBridge Clone System.  In the picture below, the BLUE boxes show the SitePro installed components, including original Industrial PC.  The design of the overall panel as well as the ADAM device logic, the terminal block wiring, the power tie-ins, and network devices are all SitePro's design.  The NUVO 5002e computer (upper left) is still in the panel and connected and is still running the SitePro SiteControl software in tandem with the WaterBridge Clone System.  The RED box shows the additional devices installed into the existing panel by WaterBridge personnel to bypass the original IPC and tie in the other existing components.  In addition, WaterBridge employees had unplugged

the cameras from the Moxa Switch, so that the SitePro system would not have access. Further, the cameras had additional Cat5 connections plugged in, which on information and belief, was used for WaterBridge's internal use and troubleshooting.



94.    The fact that WaterBridge has maintained SitePro's proprietary system online and functional in tandem with its own WaterBridge Clone System, and that WaterBridge has disabled cameras and taken other measures to hide its activities with the SitePro proprietary system, in addition to the many activities discussed above, all confirm that WaterBridge is using SitePro's proprietary system to troubleshoot, repair, improve and "sandbox" the WaterBridge Clone System. On information and belief, WaterBridge has maintained SitePro's proprietary system at other EVX facilities in a similar manner and for a similar purpose as the EVX Bronco SWD facility. WaterBridge has not terminated any of the EVX/SitePro contracts so it can continue to add

authorized users and access the SitePro proprietary system for the purpose of using SitePro's trade secrets for its own improper and unlawful purposes.

95.   Further, in 2022 and 2023, WaterBridge employees also were running SitePro's proprietary system in tandem with WaterBridge's Clone System to monitor and control the EVX Firefox SWD facility, as well as to troubleshoot, adapt and error-check the WaterBridge Clone System.   Indeed, the modem that was connected at the EVX Firefox facility was still being managed by SitePro at the time with SitePro's Verizon Wireless cellular accounts, which WaterBridge used for its own WaterBridge Clone System.   SitePro provided all of the custom configuration files for the provided modem and internal network setup.

96.   Indeed, in 2020, in a conversation with SitePro founder Aaron Phillips, WaterBridge's Charles Lame admitted that he doubted WaterBridge's own technology would ever be as good as SitePro's technology.   That admission confirms WaterBridge's unlawful motive for continuing its unauthorized access and use of SitePro's proprietary system.

97.   On information and belief, TIGA provided additional assistance to WaterBridge in converting the EVX SWD facility sites from SitePro to TIGA, and in also accessing and making unauthorized use of the SitePro Proprietary systems running on the EVX SWD facility sites.

98.   By letter dated February 16, 2023, SitePro provided written notice of material breach to EVX Midstream noting that EVX had materially breached its agreements with SitePro by providing access to SitePro's confidential information to employees of WaterBridge and allowing use and disclosure of such SitePro confidential information for the purposes of converting to, testing, troubleshooting, improving, benchmarking and otherwise developing the competing WaterBridge system.   In this notice, SitePro cited to provisions in the SitePro/EVX agreements prohibiting unauthorized use and disclosure of SitePro's proprietary system, prohibiting reverse

engineering and derivation of SitePro's proprietary system, and prohibiting use of SitePro's proprietary system for purposes of competitive analysis or development of a competing software product.   SitePro noted that EVX's actions of allowing and/or assisting WaterBridge's access to SitePro's proprietary system, including its software, for the purpose of converting to, improving, testing, troubleshooting, benchmarking and otherwise developing the competing WaterBridge system caused EVX to be in material breach. Although the SitePro/EVX agreements provided SitePro the right to immediately suspend EVX's access to SitePro's proprietary system, SitePro provided EVX thirty days in which to cure its breaches so as to minimize any potential negative impact to EVX.

99.   On March 3, 2023, EVX Midstream responded to SitePro's notice with conclusory denials of breach, providing no detailed explanations for its actions nor any suggestions for how the alleged breaches could be cured or SitePro's proprietary system could be safeguarded in a way that EVX could continue to use SitePro's system.   Instead, EVX indicated that it would complete migration of its remaining sites off of the SitePro platform by the 30-day period set forth in SitePro's notice letter.

100. On information and belief, WaterBridge assisted, encouraged, induced and/or caused the actions of EVX that formed the basis of SitePro's notice of material breach.

**SitePro Trade Secrets Compromised by WaterBridge and TIGA**

101. Through its unlawful actions, including but not limited to as discussed in this Complaint, WaterBridge and TIGA have misappropriated significant trade secrets owned by SitePro.  Below is a high-level description of some of the trade secrets that WaterBridge and TIGA have misappropriated.  This list is for exemplary purposes and does not limit the number of trade secrets at issue in this lawsuit.

(a)      <u>Camera Configuration</u> -- SitePro has developed a novel approach to configuring the cameras in its system to align and sync live monitoring and events such as alarms and truck ticketing.  This trade secret information was available only through authorized user access of SitePro's Industrial PC or Web platform.

(b)      <u>Control Narrative</u> (including Sensor Equations; Alarm logic, actuator control; alert set points, and certain control functionalities (meters, etc.)) --Through its experience, SitePro has developed specific settings, data flow, equations and data structure (collectively, the "Control Narrative") that enable real-time monitoring and variable control.  This trade secret information was available only through authorized user access of SitePro's Industrial PC or Web platform.

(c)      <u>Meter Information</u> -- SitePro developed a novel approach to the way a water-gathering system bills its customers, and created unique ways to summarize and manage the volumes and flow direction in a real-time, remote-control system throughout a complex network of pipes carrying the fluids.  In addition, SitePro developed a novel approach that incorporated ticketing data from truck deliveries into this same information.  This trade secret information was available only through authorized user access of SitePro's Industrial PC or Web platform.

(d)      <u>Data Entry for Ticketing</u> -- SitePro developed a unique electronic entry system for truck ticketing entry at the point of delivery that automated the collection of such data and additionally improved and allowed for more efficient error identification and correction.  This trade secret information was available only through authorized user access of SitePro's Industrial PC or Web platform.

(e)      <u>Ticket Reconciliation System</u> -- SitePro developed a unique approach for reconciling a customer's electronic tickets with its accounting software while identifying the

tickets and invoices that need attention, and also pulling in the necessary regulatory reports.  This trade secret information was available only through authorized user access of SitePro's Industrial PC or Web platform.

(f)     Optimal Parameters and Set Points -- Through its years of experience, SitePro has developed optimal initial settings and operational parameters, plus additional safeguards, for facility equipment such as valves, pumps, actuators and sensors.  This trade secret information was available only through authorized user access of SitePro's Industrial PC or Web platform.

(g)     Throttle Valve -- Through its experience, SitePro developed a unique approach to regulating fluid flow without having to stop and start the main pumps, which allows for fine tuning of the system and reduces equipment wear.  This trade secret information was available only through authorized user access of SitePro's Industrial PC or Web platform.

(h)     Data capture, Structure and Algorithms -- Through its experience, SitePro developed significant proprietary knowledge regarding what data to capture, how to capture the data, how to group and sort the data, how to maintain it, and how to use that data via analytics algorithms to manage and control a facility site.  This trade secret information was available only through authorized user access to SitePro's Industrial PC or Web platform.

(i)     Camera Streaming -- SitePro developed a unique way of streaming cameras for use in real-time monitoring and control.  This trade secret information was available only through authorized user access of SitePro's Industrial PC or Web platform.

(j)     Field Data Capture -- SitePro developed a unique way for customers using their mobile application to capture data from equipment in the field that may not be connected to the system, may be without power, or whose sensors may be malfunctioning, and have that data

flow into the SitePro proprietary system.  This trade secret information was available only through authorized user access of SitePro's Mobile App or Web platform.

(k)     <u>Pre-configuration in System Architecture</u> -- SitePro developed a unique system that provides context to the nodes and equipment that are added to a facility to preconfigure them so that its customers may build and expand their system faster and more efficiently.  This trade secret information was available only through authorized user access of SitePro's Industrial PC or Web platform.

(l)     <u>Mobile Application</u> -- SitePro developed a unique mobile application for its SitePro proprietary system, the development of which included significant trial and error and improvement over time.  SitePro developed significant proprietary know-how regarding the development and use of its mobile application.  This trade secret information was available only through authorized user access of SitePro's mobile app.

(m)     <u>Load Balancing</u> -- SitePro developed and implemented into its proprietary platform and software a unique and automatic ability to load balance fluid, and incoming / anticipated fluid deliveries, among a network of facilities while tracking the fluid for regulatory reporting.  This trade secret information was available only through authorized user access of SitePro's Industrial PC or Web platform.

(n)     <u>Filter System</u> -- SitePro designed a unique filter system using code tracking with sensors and automatic rotation to reduce the need for constant manual monitoring and filter replacement.  This trade secret information was available only through authorized user access of SitePro's Industrial PC or Web platform.

102.     Defendants' actions are unfair and unlawful. Defendants have received tangible and intangible benefit from their unauthorized use of SitePro's proprietary technology (including trade

secrets, confidential information and patented technology) and falsely associating their infringing products with SitePro, and Defendants actions threaten to give Defendants a special advantage in competition with SitePro as Defendants were not burdened by the expenses of time, money, and effort the SitePro was forced to undertake to develop its systems, brand, and marks.

103.    On February 15, 2023, SitePro sent a Chapter 38 Letter regarding this matter to WaterBridge, and on February 16, 2023, SitePro sent a Notice of Termination to WaterBridge's EVX Midstream Partners.   Despite this correspondence, WaterBridge failed to comply with SitePro's demands and continues its unlawful conduct constituting breach, misappropriation, and infringing activities.   SitePro has been forced to retain counsel to pursue its legal remedies and secure WaterBridge's compliance with its contractual obligations, entitling SitePro to recovery of its reasonable attorneys' fees and costs under Texas Civil Practices and Remedies Code Section 38.001.

## COUNT I

### Misappropriation of Trade Secrets Under Federal Law

104. SitePro repeats and realleges, as if fully set forth herein, the allegations set forth in the foregoing paragraphs of this Complaint.

105. SitePro's trade secrets, as noted above, contained significant and critical confidential and proprietary information relating to SitePro's business that was not known in the industry.   Such trade secret information was exclusively SitePro's property and not the subject of any technology owned, retained or licensed-back from WaterBridge.

106. SitePro's trade secrets described in the preceding paragraphs constitutes "trade secrets" as defined 18 U.S.C. § 1839(3).   Among other things, these SitePro trade secrets constitute "financial, business, technical, [and/or] economic" information.

107. SitePro has taken reasonable precautions to protect and maintain the value of its trade secrets, as described above.

108. SitePro's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, competitors who can obtain economic value from the disclosure or use of the information.  For example, these trade secrets have been used to develop SitePro's proprietary system, which significantly advanced the state-of-the-art in fluid analytics, monitoring and control.  SitePro's proprietary system was developed and released years before the Ignition software was available for companies like TIGA and WaterBridge to implement.

109. In violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, WaterBridge and TIGA misappropriated SitePro's trade secrets.  Specifically, WaterBridge and TIGA misappropriated SitePro's trade secrets through improper means, and via at least the theft of and breach of contractual duties owed to SitePro.  WaterBridge and TIGA continued to access SitePro's trade secrets through improper means by access and use of SitePro's proprietary system at the EVX facility sites.

110. WaterBridge and TIGA further misappropriated SitePro's trade secrets by their unauthorized use and disclosure of SitePro's trade secrets for the development, implementation, testing, troubleshooting and continued refinement of the WaterBridge Clone System at both WaterBridge and EVX facilities.  Such use and disclosure constitute misappropriation under the DTSA.

111. WaterBridge and TIGA misappropriated SitePro's trade secrets after May 11, 2016, the effective date of the DTSA.

112. WaterBridge and TIGA knew or had reason to know that they acquired knowledge of the trade secrets under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and/or to limit their use (i.e., in the course WaterBridge's contractual relationship with SitePro). *See* 18 U.S.C. § 1839(5) (defining misappropriation of trade secrets).

113. WaterBridge and TIGA misappropriation impacts and affects interstate commerce because their illegal actions have taken place in Texas and Oklahoma at WaterBridge's facility sites in both states.

114. SitePro has suffered and will continue to suffer injury as alleged above as a direct and proximate result of WaterBridge and TIGA's willful misappropriation of SitePro's trade secrets.  As a direct and proximate cause of WaterBridge and TIGA's misappropriation of SitePro's confidential and proprietary trade secrets, WaterBridge and TIGA have been unjustly enriched and SitePro has sustained damages in an amount to be proven at trial.  In lieu of damages measured by any other methods, SitePro shall be entitled to a reasonable royalty for WaterBridge and TIGA's misappropriation of SitePro's trade secrets.

115. WaterBridge and TIGA knew or should have known that their unauthorized access to SitePro's trade secrets was illegal, and their misappropriation of those trade secrets has been willful and malicious, entitling SitePro to an award of exemplary damages under the DTSA.

116. SitePro is also entitled to an award of its reasonable attorney's fees under the DTSA because WaterBridge and TIGA willfully and maliciously misappropriated SitePro's trade secrets.

117. WaterBridge and TIGA's wrongful use of SitePro's trade secrets has caused SitePro irreparable injury and barring a preliminary and permanent injunction against further use or disclosure of SitePro's trade secrets or other equitable relief by this Court, such irreparable injury will continue.

## COUNT II

### Misappropriation of Trade Secrets Under Texas State Law

118. SitePro repeats and realleges as if fully set forth herein, the allegations set forth in the foregoing paragraphs of this Complaint.

119. Defendant WaterBridge and TIGA's misappropriation of trade secrets, as set forth in the preceding paragraphs, also violates the Texas Uniform Trade Secrets Act (Chapter 134A of the Texas Civil Practice and Remedies Code, or "TUTSA").  As set forth above, SitePro's trade secrets information constitutes "trade secrets" under TUTSA, including proprietary formulas, patterns, compilations, programs, devices, methods, techniques and processes unique to SitePro's audio hardware, software, and subsystems.

120. As set forth above, SitePro's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, persons and entities in the fluid analytics, monitoring, and control market who can obtain economic value from its disclosure or use.

121. Further, as set forth above, SitePro's trade secrets are the subject of efforts that are reasonable under the circumstances to maintain the secrecy of these trade secrets.

122. As set forth above, WaterBridge and TIGA's actions constitute misappropriation under the TUTSA through acquisition by improper means, use and disclosure.  WaterBridge and TIGA's illegal conduct, as set forth above, entitles SitePro to an award of damages and preliminary and permanent injunctive relief pursuant to the TUTSA.  SitePro is also entitled to continuing injunctive relief for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.  For example, the development of SitePro's trade secrets regarding its SitePro proprietary system took more than three years, and any injunction against WaterBridge and TIGA should reasonably last that long.

123. Pursuant to Section 134A.004 of TUTSA, SitePro is entitled to recover damages for WaterBridge and TIGA's misappropriation in addition to injunctive relief.  SitePro's damages include both the actual loss caused by WaterBridge and TIGA's misappropriation that SitePro shall prove at trial, and also the unjust enrichment caused by WaterBridge and TIGA's misappropriation that is not taken into account in computing actual loss.  In lieu of damages measured by any other methods, the damages caused by WaterBridge and TIGA's misappropriation may also be measured by imposition of a reasonable royalty for WaterBridge and TIGA's misappropriation.   In addition, WaterBridge and TIGA's illegal conduct constitutes willful and malicious misappropriation and, therefore, SitePro is entitled to an award of exemplary damages.

124. Further, pursuant to Section 134A.005, SitePro is entitled to an award of its reasonable attorney's fees because WaterBridge and TIGA's conduct constitutes willful and malicious misappropriation.

125. WaterBridge and TIGA's conduct was also committed with "malice" as defined in Chapter 41 of the Texas Civil Practice and Remedies Code.

126. In wrongfully and intentionally taking, retaining, and using SitePro's trade secrets as outlined above, WaterBridge and TIGA have demonstrated specific intent to cause substantial injury or harm to SitePro.  WaterBridge and TIGA have committed acts amounting to fraud, malice, and gross negligence.  As such, SitePro requests exemplary damages for all causes of action for which exemplary damages are available pursuant to Texas Civil Practices and Remedies Code Chapter 41 and other applicable Texas law.

## COUNT III

### Breach of Contract

127. SitePro repeats and realleges, as if fully set forth herein, the allegations set forth in the foregoing paragraphs of this Complaint.

41

128. The agreements WaterBridge entered into with SitePro required that WaterBridge safeguard and not make unauthorized use of SitePro confidential information.

129. SitePro fulfilled its obligations under the agreements and WaterBridge's performance pursuant to these agreements was not excused.

130. WaterBridge unjustifiably and inexcusably breached his obligations under these agreements by wrongfully accessing and using SitePro's confidential information (including its trade secrets as described above) for the purpose of developing the WaterBridge Clone System. WaterBridge also breached these agreements by disclosing and transferring proprietary and confidential SitePro property and information to TIGA, and by hiding the true nature of TIGA's involvement and access to SitePro's proprietary system. WaterBridge continued to breach these agreements through its wrongful and illegal actions at the EVX facility sites, as noted above.

131. WaterBridge's continuing and recent actions demonstrate that WaterBridge has used and intends to continue to use and disclose SitePro's confidential information in violation of the agreements.

132. As a result of WaterBridge's breaches, SitePro has suffered and will imminently suffer further harm, including the loss of confidential and proprietary information, competitive position, existing customers, and goodwill. SitePro is entitled to an award of damages for WaterBridge's breach of contract.

133. In addition, these agreements provide that SitePro shall be entitled to enforce WaterBridge's obligations by injunction without bond. The direct threat of continuing breaches by WaterBridge will cause irreparable harm to SitePro, and thus SitePro in entitled to preliminary and permanent injunctive relief against WaterBridge.

134. SitePro has been forced to retain counsel to present claims and demands to WaterBridge through this lawsuit to remedy past breaches and stop future breaches by WaterBridge.  Despite being given the opportunity to do so, WaterBridge has refused to comply with SitePro's claims and demands to rectify WaterBridge's breach of contract.  SitePro thus is entitled to recover its reasonable attorneys' fees and costs pursuant to Texas Civil Practices and Remedies Code Section 38.001.

## COUNT IV

### Computer Fraud and Abuse Act
(18 U.S.C. § 1030)

135. SitePro repeats and realleges, as if fully set forth herein, the allegations set forth in the foregoing paragraphs of this Complaint.

136. WaterBridge and TIGA have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(c).  WaterBridge purchased the Industrial PCs, hardware and computers used in or affecting interstate commerce or communication, containing SitePro's proprietary system, but only under conditions on how it could use SitePro's proprietary system contained on such Industrial PCs.  WaterBridge is exceeding its authorized access to the Industrial PCs for the improper purpose of making unauthorized use of SitePro's proprietary information and trade secrets residing on those computers and thereby improperly obtaining information from such a protected computer thus causing SitePro significant damage.

137. WaterBridge and TIGA have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4), by knowingly, and with intent to defraud SitePro through its wrongful actions, accessing the SitePro proprietary system with an improper purpose, including on the Industrial PCs, a protected computer, exceeding authorized access to such a computer, and, by means of such conduct, furthering its intended fraud and obtained one or more things of value,

including, but not limited to, significant and critical confidential and proprietary information relating to SitePro's hardware, software and subsystems.  Such confidential and proprietary information was exclusively SitePro's property, as set forth in the contracts between SitePro and WaterBridge, and not the subject of any technology owned, retained or licensed back to WaterBridge.

138. WaterBridge and TIGA have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, by intentionally accessing SitePro's proprietary system, on the Industrial PCs, which are protected computers, beyond the scope of the authorization granted, causing damage to SitePro, recklessly or without due regard for its actions.

139. The SitePro proprietary system, including on the Industrial PCs, that WaterBridge and TIGA accessed as described above constitutes a "protected computer" within the meaning of 18 U.S.C. § 1030.

140.  SitePro has been harmed by these violations, and the harm amounts to over $5,000 aggregated over a one-year period.

141.  WaterBridge and TIGA's unlawful access to, and misappropriations of property and information from SitePro, have also caused and will continue to cause SitePro irreparable injury.  Unless restrained and enjoined, WaterBridge and TIGA will continue to commit such acts. Damages are not adequate to compensate SitePro for these actual and threatened injuries, and SitePro is therefore entitled to injunctive relief as provided by 18 U.S.C. § 1030(g).

### COUNT V

### Civil Conspiracy

142. SitePro repeats and realleges, as if fully set forth herein, the allegations set forth in the foregoing paragraphs of this Complaint.

143. WaterBridge and TIGA are two, separate entities.

144. WaterBridge and TIGA conspired to misappropriate, steal, and use for their unlawful gain, SitePro's trade secret information.  To this end, WaterBridge and TIGA knew and agreed that they could not accomplish the misappropriation, theft, and misuse without their collective actions.

145. WaterBridge and TIGA had a meeting of the minds, a shared commitment to their conspiratorial undertakings.  In fact, they secreted the actual purpose for TIGA's access to SitePro's proprietary system in furtherance of their conspiracy. Their conspiracy benefited WaterBridge and TIGA, for their collective purposes and benefits, as described above.

146. In furtherance of the conspiracy, WaterBridge and TIGA undoubtedly communicated by telephone, text, email, and through in-person meetings to determine what actions to take and what SitePro confidential information and trade secrets to target, and how to acquire and use that information to develop, test, troubleshoot and improve the WaterBridge Clone System.

147. Additionally, WaterBridge and TIGA advanced the conspiracy by, inter alia, (a) accessing SitePro's trade secrets by unauthorized access to the SitePro proprietary system, and other means made available through the deception of SitePro; (b) misappropriating and stealing the accessed information; (c) converting EVX facility sites using the information unlawfully pilfered; and (d) converting EVX to WaterBridge.

148. The conspiracy has caused SitePro damages.  SitePro has suffered actual damages because of WaterBridge and TIGA's conspiratorial undertaking, including lost business and costs incurred to try and replace business lost to the conspiracy.  The amount of these damages will be determined at trial.

149. WaterBridge and TIGA are jointly and severally liable for the damages they have caused SitePro through the conspiracy.

## COUNT VI

### Tortious Interference With Contractual Relations

150. SitePro repeats and realleges, as if fully set forth herein, the allegations set forth in the foregoing paragraphs of this Complaint.

151. SitePro and EVX had numerous written contracts.

152. Each of these agreements was active at the time of WaterBridge's actions, as noted above.

153. WaterBridge knew well of the SitePro/EVX contracts, and even requested them from SitePro.

154. WaterBridge willfully and intentionally interfered with the SitePro/EVX contracts with full knowledge that EVX was under contract with SitePro.

155. WaterBridge's interference has injured SitePro.  The interference led to the conversion of the EVX facilities from the SitePro proprietary system to the WaterBridge Clone System, and for the misuse of the SitePro proprietary system existing and maintained on the EVX facilities to troubleshoot, test and improve the WaterBridge Clone System in violation of the EVX contracts.

156. SitePro has suffered actual damages because of WaterBridge's contract interference, including lost business and costs incurred to try repair its contractual relations with EVX disrupted through interference.  The amount of these damages will be determined at trial.

## COUNT VII

### Infringement of U.S. Patent No. 8,649,909

157. SitePro repeats and realleges, as if fully set forth herein, the allegations set forth in the foregoing paragraphs of this Complaint.

158. Defendants each directly infringed and continue to directly infringe, under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, at least claims 1-17, and 19-21 of the '909 Patent by manufacturing, using, selling, offering to sell, and/or importing into the United States the WaterBridge Clone System.

159. Defendants have been and are indirectly infringing the '909 Patent by actively inducing or contributing to the direct infringement by others of the '909 Patent in the United States, the State of Texas, and this District.

160. Defendants also have been and are now knowingly and intentionally inducing infringement of at least claims 1-17, and 19-21 of the '909 Patent in violation of 35 U.S.C. § 271(b). WaterBridge and TIGA have had knowledge of the '909 Patent and the infringing nature of the WaterBridge Clone System since at least the filing and service of this Complaint.

161. Defendants specifically intended and were aware that the ordinary and customary use of the WaterBridge Clone System would infringe the '909 Patent.

162. Defendants further took active steps to encourage end users to use and operate the WaterBridge Clone System, despite knowing of the '909 Patent, in a manner they knew to directly infringe at least claims 1-17, and 19-21 of the '909 Patent. Further, Defendants provided product manuals and other technical information that cause their subscribers, customers, and other third parties to use and to operate the WaterBridge Clone System for their ordinary and customary use,

such that Defendants' customers and other third parties have directly infringed the '909 Patent, through the normal and customary use of the WaterBridge Clone System.

163. Defendants also have been and are now in violation of 35 U.S.C. § 271(c) by contributing to infringement of at least claims 1-17, and 19-21 of the '909 Patent, literally and/or under the doctrine of equivalents, by, among other things, selling, offering for sale, and/or importing within this judicial district and elsewhere in the United States, the WaterBridge Clone System with knowledge of the '909 patent and knowing that the WaterBridge Clone System is especially made or especially adapted for use in the infringement of the '909 patent, and is not a staple article or commodity of commerce suitable for substantial noninfringing use.

164. The Defendants' infringement (both direct and indirect) of the '909 Patent has been, and continues to be, with full knowledge of the '909 Patent, since at least as early as the filing of this lawsuit, and upon information and belief, since well before the filing of this lawsuit based on the fact that Defendants have intentionally copied SitePro's system (including its patented technology) and have accessed SitePro's website and contracts, which specifically reference the '909 Patent.

165. Exhibit G details the manner in which the WaterBridge Clone System infringes this patent by way of an exemplary chart.

166. As a result of Defendants' infringement of the '909 Patent, SitePro has been damaged and is entitled to recover from Defendants the damages sustained by SitePro as a result of Defendants' acts in an amount adequate to compensate SitePro for Defendants' infringement, subject to proof at trial.

167. The Defendants' knowing, willful and deliberate copying of SitePro system, including infringement of at least the claims of the '909 Patent, is in conscious disregard of

SitePro's rights, makes this case exceptional within the meaning of 35 U.S.C. § 285, and justifies

treble damages pursuant to 35 U.S.C. § 284, as well as attorneys' fees pursuant to 35 U.S.C. § 285.

<u>COUNT VIII</u>

**Infringement of U.S. Patent No. 9,342,078**

168. SitePro repeats and realleges, as if fully set forth herein, the allegations set forth in

the foregoing paragraphs of this Complaint.

169. Defendants each directly infringed and continue to directly infringe, under 35

U.S.C. § 271(a), literally and/or under the doctrine of equivalents, at least claims 1-9, 11-13, 15-

19 of the '078 Patent by manufacturing, using, selling, offering to sell, and/or importing into the

United States the WaterBridge Clone System.

170. Defendants have been and are indirectly infringing the '078 Patent by actively

inducing or contributing to the direct infringement by others of the '078 Patent in the United States,

the State of Texas, and this District.

171. Defendants also have been and are now knowingly and intentionally inducing

infringement of at least claims 1-9, 11-13, 15-19 of the '078 Patent in violation of 35 U.S.C. §

271(b).  WaterBridge and TIGA have had knowledge of the '078 Patent and the infringing nature

of the WaterBridge Clone System since at least the filing and service of this Complaint.

172. Defendants specifically intended and were aware that the ordinary and customary

use of the WaterBridge Clone System would infringe the '078 Patent.

173. Defendants further took active steps to encourage end users to use and operate the

WaterBridge Clone System, despite knowing of the '078 Patent, in a manner they knew to directly

infringe at least claims 1-9, 11-13, 15-19 of the '078 Patent.  Further, Defendants provided product

manuals and other technical information that cause their subscribers, customers, and other third

49

parties to use and to operate the WaterBridge Clone System for their ordinary and customary use, such that Defendants' customers and other third parties have directly infringed the '078 Patent, through the normal and customary use of the WaterBridge Clone System.

174. Defendants also have been and are now in violation of 35 U.S.C. § 271(c) by contributing to infringement of least claims 1-9, 11-13, 15-19 of the '078 Patent, literally and/or under the doctrine of equivalents, by, among other things, selling, offering for sale, and/or importing within this judicial district and elsewhere in the United States, the WaterBridge Clone System with knowledge of the '078 patent and knowing that the WaterBridge Clone System is especially made or especially adapted for use in the infringement of the '078 patent, and is not a staple article or commodity of commerce suitable for substantial noninfringing use.

175. The Defendants' infringement (both direct and indirect) of the '078 Patent has been, and continues to be, with full knowledge of the '078 Patent, since at least as early as the filing of this lawsuit, and upon information and belief, since well before the filing of this lawsuit based on the fact that Defendants have intentionally copied SitePro's system (including its patented technology) and have accessed SitePro's website and contracts, which specifically reference the '078 Patent.

176. Exhibit H details the manner in which the WaterBridge Clone System infringes this patent by way of an exemplary chart.

177. As a result of Defendants' infringement of the '078 Patent, SitePro has been damaged and is entitled to recover from Defendants the damages sustained by SitePro as a result of Defendants' acts in an amount adequate to compensate SitePro for Defendants' infringement, subject to proof at trial.

178. The Defendants' knowing, willful and deliberate copying of SitePro system, including infringement of at least the claims of the '078 Patent, is in conscious disregard of SitePro's rights, makes this case exceptional within the meaning of 35 U.S.C. § 285, and justifies treble damages pursuant to 35 U.S.C. § 284, as well as attorneys' fees pursuant to 35 U.S.C. § 285.

**COUNT IX**

**Infringement of U.S. Patent No. 9,898,014**

179. SitePro repeats and realleges, as if fully set forth herein, the allegations set forth in the foregoing paragraphs of this Complaint.

180. Defendants each directly infringed and continue to directly infringe, under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, at least claims 1-23 of the '014 Patent by manufacturing, using, selling, offering to sell, and/or importing into the United States the WaterBridge Clone System.

181. Defendants have been and are indirectly infringing the '014 Patent by actively inducing or contributing to the direct infringement by others of the '014 Patent in the United States, the State of Texas, and this District.

182. Defendants also have been and are now knowingly and intentionally inducing infringement of at least claims 1-23 of the '014 Patent in violation of 35 U.S.C. § 271(b). WaterBridge and TIGA have had knowledge of the '014 Patent and the infringing nature of the WaterBridge Clone System since at least the filing and service of this Complaint.

183. Defendants specifically intended and were aware that the ordinary and customary use of the WaterBridge Clone System would infringe the '014 Patent.

184. Defendants further took active steps to encourage end users to use and operate the WaterBridge Clone System, despite knowing of the '014 Patent, in a manner they knew to directly

infringe at least claims 1-23 of the '014 Patent.  Further, Defendants provided product manuals and other technical information that cause their subscribers, customers, and other third parties to use and to operate the WaterBridge Clone System for their ordinary and customary use, such that Defendants' customers and other third parties have directly infringed the '014 Patent, through the normal and customary use of the WaterBridge Clone System.

185. Defendants also have been and are now in violation of 35 U.S.C. § 271(c) by contributing to infringement of at least claims 1-23 of the '014 Patent, literally and/or under the doctrine of equivalents, by, among other things, selling, offering for sale, and/or importing within this judicial district and elsewhere in the United States, the WaterBridge Clone System with knowledge of the '014 patent and knowing that the WaterBridge Clone System is especially made or especially adapted for use in the infringement of the '014 patent, and is not a staple article or commodity of commerce suitable for substantial noninfringing use.

186. The Defendants' infringement (both direct and indirect) of the '014 Patent has been, and continues to be, with full knowledge of the '014 Patent, since at least as early as the filing of this lawsuit, and upon information and belief, since well before the filing of this lawsuit based on the fact that Defendants have intentionally copied SitePro's system (including its patented technology) and have accessed SitePro's website and contracts, which specifically reference the '014 Patent.

187. Exhibit I details the manner in which the WaterBridge Clone System infringes this patent by way of an exemplary chart.

188. As a result of Defendants' infringement of the '014 Patent, SitePro has been damaged and is entitled to recover from Defendants the damages sustained by SitePro as a result

of Defendants' acts in an amount adequate to compensate SitePro for Defendants' infringement, subject to proof at trial.

189. The Defendants' knowing, willful and deliberate copying of SitePro system, including infringement of at least the claims of the '014 Patent, is in conscious disregard of SitePro's rights, makes this case exceptional within the meaning of 35 U.S.C. § 285, and justifies treble damages pursuant to 35 U.S.C. § 284, as well as attorneys' fees pursuant to 35 U.S.C. § 285.

## COUNT X

### Infringement of U.S. Patent No. 10,488,871

190. SitePro repeats and realleges, as if fully set forth herein, the allegations set forth in the foregoing paragraphs of this Complaint.

191. Defendants each directly infringed and continue to directly infringe, under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, at least claims 18-34 of the '871 Patent by manufacturing, using, selling, offering to sell, and/or importing into the United States the WaterBridge Clone System.

192. Defendants have been and are indirectly infringing the '871 Patent by actively inducing or contributing to the direct infringement by others of the '871 Patent in the United States, the State of Texas, and this District.

193. Defendants also have been and are now knowingly and intentionally inducing infringement of at least claims 18-34 of the '871 Patent in violation of 35 U.S.C. § 271(b). WaterBridge and TIGA have had knowledge of the '871 Patent and the infringing nature of the WaterBridge Clone System since at least the filing and service of this Complaint.

194. Defendants specifically intended and were aware that the ordinary and customary use of the WaterBridge Clone System would infringe the '871 Patent.

195. Defendants further took active steps to encourage end users to use and operate the WaterBridge Clone System, despite knowing of the '871 Patent, in a manner they knew to directly infringe at least claims 18-34 of the '871 Patent.  Further, Defendants provided product manuals and other technical information that cause their subscribers, customers, and other third parties to use and to operate the WaterBridge Clone System for their ordinary and customary use, such that Defendants' customers and other third parties have directly infringed the '871 Patent, through the normal and customary use of the WaterBridge Clone System.

196. Defendants also have been and are now in violation of 35 U.S.C. § 271(c) by contributing to infringement of at least claims 18-34 of the '871 Patent, literally and/or under the doctrine of equivalents, by, among other things, selling, offering for sale, and/or importing within this judicial district and elsewhere in the United States, the WaterBridge Clone System with knowledge of the '871 patent and knowing that the WaterBridge Clone System is especially made or especially adapted for use in the infringement of the '871 patent, and is not a staple article or commodity of commerce suitable for substantial noninfringing use.

197. The Defendants' infringement (both direct and indirect) of the '871 Patent has been, and continues to be, with full knowledge of the '871 Patent, since at least as early as the filing of this lawsuit, and upon information and belief, since well before the filing of this lawsuit based on the fact that Defendants have intentionally copied SitePro's system (including its patented technology) and have accessed SitePro's website and contracts, which specifically reference the '871 Patent.

198. Exhibit J details the manner in which the WaterBridge Clone System infringes this patent by way of an exemplary chart.

199. As a result of Defendants' infringement of the '871 Patent, SitePro has been damaged and is entitled to recover from Defendants the damages sustained by SitePro as a result of Defendants' acts in an amount adequate to compensate SitePro for Defendants' infringement, subject to proof at trial.

200. The Defendants' knowing, willful and deliberate copying of SitePro system, including infringement of at least the claims of the '871 Patent, is in conscious disregard of SitePro's rights, makes this case exceptional within the meaning of 35 U.S.C. § 285, and justifies treble damages pursuant to 35 U.S.C. § 284, as well as attorneys' fees pursuant to 35 U.S.C. § 285.

## COUNT XI

### Infringement of U.S. Patent No. 11,175,680

201. SitePro repeats and realleges, as if fully set forth herein, the allegations set forth in the foregoing paragraphs of this Complaint.

202. Defendants each directly infringed and continue to directly infringe, under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, at least claims 1-20 of the '680 Patent by manufacturing, using, selling, offering to sell, and/or importing into the United States the WaterBridge Clone System.

203. Defendants have been and are indirectly infringing the '680 Patent by actively inducing or contributing to the direct infringement by others of the '680 Patent in the United States, the State of Texas, and this District.

204. Defendants also have been and are now knowingly and intentionally inducing infringement of at least claims 1-20 of the '680 Patent in violation of 35 U.S.C. § 271(b). WaterBridge and TIGA have had knowledge of the '680 Patent and the infringing nature of the WaterBridge Clone System since at least the filing and service of this Complaint.

205. Defendants specifically intended and were aware that the ordinary and customary use of the WaterBridge Clone System would infringe the '680 Patent.

206. Defendants further took active steps to encourage end users to use and operate the WaterBridge Clone System, despite knowing of the '680 Patent, in a manner they knew to directly infringe at least claims 1-20 of the '680 Patent.  Further, Defendants provided product manuals and other technical information that cause their subscribers, customers, and other third parties to use and to operate the WaterBridge Clone System for their ordinary and customary use, such that Defendants' customers and other third parties have directly infringed the '680 Patent, through the normal and customary use of the WaterBridge Clone System.

207. Defendants also have been and are now in violation of 35 U.S.C. § 271(c) by contributing to infringement of at least claims 1-20 of the '680 Patent, literally and/or under the doctrine of equivalents, by, among other things, selling, offering for sale, and/or importing within this judicial district and elsewhere in the United States, the WaterBridge Clone System with knowledge of the '680 patent and knowing that the WaterBridge Clone System is especially made or especially adapted for use in the infringement of the '680 patent, and is not a staple article or commodity of commerce suitable for substantial noninfringing use.

208. The Defendants' infringement (both direct and indirect) of the '680 Patent has been, and continues to be, with full knowledge of the '680 Patent, since at least as early as the filing of this lawsuit, and upon information and belief, since well before the filing of this lawsuit based on the fact that Defendants have intentionally copied SitePro's system (including its patented technology) and have accessed SitePro's website and contracts, which specifically reference the '680 Patent.

209. Exhibit K details the manner in which the WaterBridge Clone System infringes this patent by way of an exemplary chart.

210. As a result of Defendants' infringement of the '680 Patent, SitePro has been damaged and is entitled to recover from Defendants the damages sustained by SitePro as a result of Defendants' acts in an amount adequate to compensate SitePro for Defendants' infringement, subject to proof at trial.

211. The Defendants' knowing, willful and deliberate copying of SitePro system, including infringement of at least the claims of the '680 Patent, is in conscious disregard of SitePro's rights, makes this case exceptional within the meaning of 35 U.S.C. § 285, and justifies treble damages pursuant to 35 U.S.C. § 284, as well as attorneys' fees pursuant to 35 U.S.C. § 285.

## COUNT XII

### Infringement of U.S. Patent No. 11,294,403

212. SitePro repeats and realleges, as if fully set forth herein, the allegations set forth in the foregoing paragraphs of this Complaint.

213. Defendants each directly infringed and continue to directly infringe, under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, at least claims 1-30 of the '403 Patent by manufacturing, using, selling, offering to sell, and/or importing into the United States the WaterBridge Clone System.

214. Defendants have been and are indirectly infringing the '403 Patent by actively inducing or contributing to the direct infringement by others of the '403 Patent in the United States, the State of Texas, and this District.

215. Defendants also have been and are now knowingly and intentionally inducing infringement of at least claims 1-30 of the '403 Patent in violation of 35 U.S.C. § 271(b).

WaterBridge and TIGA have had knowledge of the '403 Patent and the infringing nature of the WaterBridge Clone System since at least the filing and service of this Complaint.

216. Defendants specifically intended and were aware that the ordinary and customary use of the WaterBridge Clone System would infringe the '403 Patent.

217. Defendants further took active steps to encourage end users to use and operate the WaterBridge Clone System, despite knowing of the '403 Patent, in a manner they knew to directly infringe at least claims 1-30 of the '403 Patent.  Further, Defendants provided product manuals and other technical information that cause their subscribers, customers, and other third parties to use and to operate the WaterBridge Clone System for their ordinary and customary use, such that Defendants' customers and other third parties have directly infringed the '403 Patent, through the normal and customary use of the WaterBridge Clone System.

218. Defendants also have been and are now in violation of 35 U.S.C. § 271(c) by contributing to infringement of at least claims 1-30, literally and/or under the doctrine of equivalents, by, among other things, selling, offering for sale, and/or importing within this judicial district and elsewhere in the United States, the WaterBridge Clone System with knowledge of the '403 patent and knowing that the WaterBridge Clone System is especially made or especially adapted for use in the infringement of the '403 patent, and is not a staple article or commodity of commerce suitable for substantial noninfringing use.

219. The Defendants' infringement (both direct and indirect) of the '403 Patent has been, and continues to be, with full knowledge of the '403 Patent, since at least as early as the filing of this lawsuit, and upon information and belief, since well before the filing of this lawsuit based on the fact that Defendants have intentionally copied SitePro's system (including its patented

technology) and have accessed SitePro's website and contracts, which specifically reference the '403 Patent.

220. Exhibit L details the manner in which the WaterBridge Clone System infringes this patent by way of an exemplary chart.

221. As a result of Defendants' infringement of the '403 Patent, SitePro has been damaged and is entitled to recover from Defendants the damages sustained by SitePro as a result of Defendants' acts in an amount adequate to compensate SitePro for Defendants' infringement, subject to proof at trial.

222. The Defendants' knowing, willful and deliberate copying of SitePro system, including infringement of at least the claims of the '403 Patent, is in conscious disregard of SitePro's rights, makes this case exceptional within the meaning of 35 U.S.C. § 285, and justifies treble damages pursuant to 35 U.S.C. § 284, as well as attorneys' fees pursuant to 35 U.S.C. § 285.

## COUNT XIII

**Trademark Infringement under § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1)**

223. SitePro repeats and realleges as if fully set forth herein, the allegations set forth in the foregoing paragraphs of this Complaint.

224. SitePro uses and owns the SITEPRO Registered Mark in connection with its software and services offered through SitePro's proprietary system and platform, including but not limited to, (1) SiteControl, InSite, and Command Center, SitePro's automation solutions used to monitor, configure, and control a network of facilities, pipelines, and trucks; (2) SitePro's advanced data and analytics reporting tools; (3) SiteWatch, Ops Center, and SitePro's mobile app providing real-time visibility; and (4) SiteTicket, SitePro's automated ticketing and regulatory reports with a fully customizable Ticket Center and Regulatory Center, as well as other automation software used for remote monitoring and control of fluid-based systems.

225.    The SITEPRO Registered Mark is inherently distinctive and has also acquired secondary meaning as a designation of source for SitePro.

226.    In connection with its promotion and sale of its water management solutions, including the WaterBridge Clone System, Defendant WaterBridge uses marks that are identical or virtually identical to the SITEPRO Registered Mark.

227.    Defendant WaterBridge's use of marks that are identical or virtually identical to the SITEPRO Registered Mark is likely to cause confusion and mistake and to deceive consumers and others as to the origin, sponsorship, or affiliation of the parties' products and services.  Consumers observing Defendant WaterBridge's products and services in the marketplace are likely to believe that those products or services are sponsored by, associated with, or otherwise affiliated with SitePro, when they are not.

228.    Defendant WaterBridge's use of the SITEPRO mark constitutes trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

229.    Defendant WaterBridge's use of the SITEPRO mark is a knowing, willful, and intentional violation of SitePro's rights.

230.    Defendant WaterBridge's acts of trademark infringement, unless restrained, will cause great and irreparable harm to SitePro and to the business goodwill represented by the SITEPRO Registered Mark, in an amount that cannot be ascertained at this time, leaving SitePro with no adequate remedy at law.

231.    In addition, SitePro is being and will continue to be irreparably injured through the loss of control of its brand's reputation.  WaterBridge's unauthorized use of the SITEPRO mark causes SitePro to be associated with goods and services over which it has no control. That involuntary association will injure SitePro, especially if customers are dissatisfied with

WaterBridge's goods or services for any reason and consequently have a less favorable opinion of SitePro.

232.     By reason of the foregoing, SitePro is entitled to injunctive relief against Defendant WaterBridge, restraining it from any further acts of trademark infringement, and is also entitled to recovery of Defendant WaterBridge's profits, actual damages, enhanced profits, and damages, costs, including treble damages, and reasonable attorneys' fees under 15 U.S.C. §§ 1114, 1116, and 1117.

233.     Defendant WaterBridge's acts complained of herein have been deliberate, willful, intentional, and in bad faith, with full knowledge and conscious disregard of SitePro's rights in the SITEPRO Registered Mark, and with an intent to trade on SitePro's goodwill in these marks.

## COUNT XIV

## False Designation of Origin under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)

234.     SitePro repeats and realleges as if fully set forth herein, the allegations set forth in the foregoing paragraphs of this Complaint.

235.     SitePro uses and owns the SITEPRO Registered Mark and the SITECONTROL, INSITE, SITEWATCH, and SITETICKET marks (defined herein as the "SITEPRO Marks") in connection with its software and services associated with SitePro's proprietary system and platform, including but not limited to, (1) SiteControl, InSite, and Command Center, SitePro's automation solutions used to monitor, configure, and control a network of facilities, pipelines, and trucks; (2) SitePro's advanced data and analytics reporting tools; (3) SiteWatch, Ops Center, and SitePro's mobile app providing real-time visibility; and (4) SiteTicket, SitePro's automated ticketing and regulatory reports with a fully customizable Ticket Center and Regulatory Center, as well as other automation software used for remote monitoring and control of fluid-based systems.

236.    The SITEPRO Marks are inherently distinctive and have also acquired secondary meaning as a designation of source for SitePro.

237.    In connection with its goods or services, Defendant WaterBridge uses in interstate commerce marks that are identical or virtually identical to the SITEPRO Marks.  Defendant WaterBridge's use of marks that are identical or virtually identical to the SITEPRO Marks is likely to cause confusion and mistake and to deceive consumers and others as to the origin, sponsorship, or affiliation of the parties' products.  Consumers seeing Defendant WaterBridge's products and services offered under marks that are identical or virtually identical to the SITEPRO Marks are likely to believe those products are sponsored by, associated with, or otherwise affiliated with SitePro.

238.    Defendant WaterBridge's use of marks that are identical or virtually identical to the SITEPRO Marks constitute false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

239.    Defendant WaterBridge's use of marks that are identical or virtually identical to the SITEPRO Marks is a knowing, willful, and intentional violation of SitePro's rights.

240.    Defendant WaterBridge's act of false designation of origin, unless restrained, will cause great and irreparable harm to SitePro and to the business goodwill represented by the SITEPRO Marks, in an amount that cannot be ascertained at this time, leaving SitePro with no adequate remedy at law.

241.    By reason of the foregoing paragraphs, SitePro is entitled to injunctive relief against Defendant WaterBridge, restraining it from any further acts of false designation of origin, and is also entitled to recovery of Defendant WaterBridge's profits, actual damages, enhance profits and

damages (including trebling), costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1116, 1117, and 1125.

## COUNT XV

### Trademark Infringement of Unregistered Mark Under Lanham Act, 15 U.S.C. § 1125(a)

242.    SitePro repeats and realleges as if fully set forth herein, the allegations set forth in the foregoing paragraphs of this Complaint.

243.    SitePro is the owner of the valid and protectable SITECONTROL, INSITE, SITEWATCH, and SITETICKET marks that are inherently distinctive for its automation solutions services and related products.  If not inherently distinctive, SitePro has also expended time, effort, and money promoting its salt-water disposal automation services and related products under the SITECONTROL, INSITE, SITEWATCH, and SITETICKET marks, which have come to be exclusively recognized by consumers as a designation of SitePro's monitor and control automation solution services and products and have become distinctive such that the SITECONTROL, INSITE, SITEWATCH, and SITETICKET marks have acquired "secondary meaning."

244.    Defendant WaterBridge has used the SITECONTROL, INSITE, SITEWATCH, and SITETICKET marks and/or substantially and confusingly similar variations of the SITECONTROL, INSITE, SITEWATCH, and SITETICKET marks in intrastate and interstate commerce in connection with its WaterBridge Clone System after SitePro's date of first use and without SitePro's consent.

245.    Defendant WaterBridge's unauthorized use of the SITECONTROL, INSITE, SITEWATCH, and SITETICKET marks are likely to cause confusion, to cause mistake, and to deceive consumers as to the source of origin of WaterBridge's services and products, constituting trademark infringement in violation of 15 U.S.C. § 1125(a).  Upon information and belief, such

use has damaged the reputation, recognition, and goodwill of SitePro and its SITECONTROL, INSITE, SITEWATCH, and SITETICKET marks.

246.    By reason of the foregoing, SitePro has been injured in an amount not yet ascertained and is entitled to the remedies provided for in 15 U.S.C. §§ 1116-1117, *et seq.*, including but not limited to damages, exemplary damages, attorneys' fees, and injunctive relief.

247.    Defendant WaterBridge's foregoing actions were taken with actual notice and knowledge of SitePro's rights in the SITECONTROL, INSITE, SITEWATCH, and SITETICKET marks.  WaterBridge in performing the conduct complained of herein acted willfully and with intent to injure SitePro.  SitePro is entitled to treble damages and attorneys' fees for the willful infringement.

248.    Unless restrained, Defendant WaterBridge will continue to engage in the wrongful and illegal acts described herein.  As a result, SitePro will suffer great and irreparable injury, for which damages would not afford adequate relief, in that said damages would not adequately compensate for the injury to SitePro's business reputation, goodwill, and customer base, and Defendant WaterBridge's conduct, if allowed to continue, would inevitably result in damage to SitePro. SitePro is therefore entitled to injunctive relief pursuant to 15 U.S.C. § 1116. Accordingly, SitePro seeks injunctive relief against Defendant WaterBridge for their misconduct.

## COUNT XVI

## Common Law Trademark Infringement Under Texas Law

249.    SitePro repeats and realleges as if fully set forth herein, the allegations set forth in the foregoing paragraphs of this Complaint.

250.    SitePro is the owner of the valid and protectable SITECONTROL, INSITE, SITEWATCH, and SITETICKET marks that are inherently distinctive for salt-water disposal

automation solution services and related products.  If not inherently distinctive, SitePro has also expended time, effort, and money promoting its salt-water disposal automation solution services and related products under the SITECONTROL, INSITE, SITEWATCH, and SITETICKET marks, which have come to be exclusively recognized by consumers as a designation of SitePro's services and products and has become distinctive such that the SITECONTROL, INSITE, SITEWATCH, and SITETICKET marks have acquired "secondary meaning."

251.    Defendant WaterBridge's actions and conduct in adopting and using the SITECONTROL, INSITE, SITEWATCH, and SITETICKET marks in Texas are likely to cause confusion, to cause mistake, and to deceive consumers as to the source of origin of WaterBridge's services and constitutes trademark infringement under Texas common law.

252.    Defendant WaterBridge have caused and, unless restrained and enjoined by this Court, will continue to cause irreparable harm, damage, and injury to SitePro, including but not limited to injury to SitePro's goodwill and business reputation.

253.    SitePro has no adequate remedy at law, and SitePro is being irreparably damaged by Defendant WaterBridge's acts in violation of Texas common law, entitling SitePro to injunctive relief.

254.    Defendant WaterBridge's foregoing actions were taken with actual notice and knowledge of SitePro's rights in the SITECONTROL, INSITE, SITEWATCH, and SITETICKET marks. Defendant WaterBridge in performing the conduct complained of herein acted willfully and with intent to injure SitePro. Thus, Defendant WaterBridge's actions and conduct as alleged herein are malicious and fraudulent and entitle SitePro to punitive damages.

## PRELIMINARY AND PERMANENT INJUNCTION

255. SitePro repeats and realleges, as is fully set forth herein, the allegations set forth in the foregoing paragraphs of this Complaint.

256. SitePro intends to seek expedited discovery and pursue a motion for preliminary injunction seeking at least the following immediate relief during the pendency of the lawsuit:

> (a) Prohibiting WaterBridge and TIGA from using the WaterBridge Cloned System on any EVX facility sites, or any third-party sites;
>
> (b) Prohibiting WaterBridge and TIGA from continued access to any SitePro proprietary system;
>
> (c) Prohibiting WaterBridge from using the SITEPRO Marks; and
>
> (d) Requiring written certification by WaterBridge and TIGA that they have retained no documents, computer media, storage media, or files containing SitePro confidential information.

257. SitePro also seeks a permanent injunction incorporating the relief sought above on a preliminary basis, and further (a) barring Defendant WaterBridge from competing with SitePro; (b) barring WaterBridge and TIGA from disclosing and/or using SitePro's trade secrets; and (c) providing for all additional restrictions necessary to protect SitePro from the harm likely to result from Defendant WaterBridge and TIGA's continued wrongful conduct.

258. Preliminary and permanent injunctive relief against WaterBridge and TIGA is appropriate because, as SitePro will demonstrate through separate motion and briefing:

> (a) Defendant WaterBridge and TIGA's conduct has caused and will continue to cause irreparable injury to SitePro;
>
> (b) monetary damages will be inadequate to remedy the injury;
>
> (c) an injunction is warranted considering the balance of hardships between the parties; and
>
> (d) issuing the injunction would not disserve the public interest.

*Abraham v. Alpha Chi Omega*, 708 F.3d 614, 627 (5th Cir. 2013) (citing *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

## JURY DEMAND

259.    SitePro demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, SitePro requests the Court enter judgment against WaterBridge and

TIGA as follows:

(a)    In favor of SitePro and against Defendants;

(b)    Enjoining further use or disclosure of SitePro's proprietary and confidential information, and for other relief set forth above;

(c)    Enjoining further wrongful acts by Defendants that would further irreparably injure SitePro and its intellectual property;

(d)    Enjoining further use of SITEPRO Registered Marks by Defendant WaterBridge;

(e)    Enjoining further use of SITECONTROL Mark by Defendant WaterBridge;

(f)    Ordering Defendants to account for and pay to SitePro all ill-gotten gains, profits and savings obtained or derived from his improper conduct;

(g)    That Defendants have infringed the patents-in-suit in violation of 35 U.S.C. § 271;

(h)    That WaterBridge has infringed SitePro's rights associated with SITEPRO Marks and engaged in false designation of origin in violation of 15 U.S.C. §§ 1114 and 1125(a);

(i)    Awarding SitePro its damages suffered as a result of Defendants' misappropriation, breach, and infringement, including, but not limited to Defendants' profits, SitePro's actual damages, enhanced damages, exemplary damages, costs, prejudgment and post judgment interest to be proven at trial;

(j)    Trebling SitePro's damages from Defendants due to willful, intentional, and deliberate acts;

(k)    For restitution and disgorgement of all ill-gotten gains unjustly obtained and retained by Defendants through the acts complained of herein;

(l)    Finding this case to be exceptional within the meaning of 35 U.S.C. § 285;

(m)    Awarding SitePro its costs, attorneys' fees, expenses, and interest;

(n)    Ordering destruction of (i) all infringing products, (ii) any other products that use a copy, reproduction, or colorable imitation of SITEPRO's Registered Marks, (iii) all means of making the infringing products, and (iv) all advertising materials related to the infringing products, including those on the Internet pursuant to at least 15 U.S.C. § 1118; and

(o)    Granting SitePro such other and further relief as the Court deems just and equitable.

Dated:  April 14, 2023                    Respectfully submitted,

                                            /s/ *M. Craig Tyler*
M. Craig Tyler
Texas State Bar No. 00794762
CTyler@perkinscoie.com
Dakota Kanetzky
Texas State Bar No. 24116599
DKanetzky@perkinscoie.com
PERKINS COIE LLP
405 Colorado St., Suite 1700
Austin, Texas 78701
Telephone: (737) 256-6100

Skyler M. Howton
Texas State Bar No. 24077907
SHowton@perkinscoie.com
PERKINS COIE LLP
500 N. Akard Street
Suite 3300
Dallas, TX 75201
Telephone: 214-259-4951

Heather C. Martin
(*Pro Hac Vice* to be submitted)
HeatherMartin@perkinscoie.com
PERKINS COIE LLP
700 13th Street, NW
Suite 800
Washington, D.C. 20005-3960
Telephone: (20) 654-6200

*Attorneys for Plaintiff*
*SitePro, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served via email on this the 14th day of April, 2023, upon the Defendants' counsel listed below:

| | |
|---|---|
| Brett Reasoner | Richard A. Schwartz |
| Justin D. Patrick | MUNSCH HARDT KOPF & |
| GIBBS & BRUNS LLP | HARR, P.C. |
| 1100 Louisiana Suite 5300 | 700 Milam Street |
| Houston, TX 77002 | Suite 800 |
| 713.650.8805 main | Houston, TX 77002-2806 |
| 713.750.0903 fax | T: 713.222.1470 |
| BReasoner@gibbsbruns.com | F: 713.222.1475 |
| jpatrick@gibbsbruns.com | dschwartz@munsch.com |

Additionally, a true and correct copy of the foregoing document was served on all counsel of record via the Court's ECF document filing system in accordance with the Federal Rules of Civil Procedure.

*/s/ M. Craig Tyler*
M. Craig Tyler